16 A.3d 261

**Alicia GOMEZ**

v.

**JACKSON HEWITT, INC. et al.**

**No. 1074, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

March 31, 2011.

Daniel Katz, Silver Spring, MD, & John Roddy, Boston, MA (Elizabeth Ryan, Roddy, Klein & Ryan, Patrick Perotti, Nicole T. Fiorelli, Dworken & Berstein LPA, Andalman & Flynn, on the brief), for Appellant.

Richard Brusca & Paul Solomon, Washington, DC, for Appellee.

Panel: MATRICCIANI, GRAEFF and ARRIE W. DAVIS, (Retired, Specially Assigned), JJ.

DAVIS, J.

Appellant, Alicia Gomez, appeals from the ruling of the Circuit Court for Montgomery County (Rubin, J.), dismissing her claims against appellee, Jackson Hewitt, Inc. (Jackson Hewitt). On February 4, 2009, appellant filed a Complaint against appellee alleging violations of the Credit Services Businesses Act (CSBA), Md.Code (2005 Rep. Vol., 2007 Supp.), Commercial Law, C.L. § 14–1901 *et seq.* and the Consumer Protection Act, C.L. § 13–301 *et seq.* Appellee moved to dismiss appellant's claims, which the circuit court granted.[1] Appellant noted a timely appeal to this Court and presents one question for our review, which we have rephrased as follows:

Did the circuit court err in dismissing appellant's claims on the grounds that the CSBA does not apply to appellee?

For the reasons that follow, we answer appellant's question in the negative. Accordingly, we affirm the judgment of the circuit court.

---

1. This case was initially filed as a class action, but appellant did not file a Motion for Class Certification. The circuit court explained, in its Memorandum Opinion and Order dismissing appellant's claims, that it would initially make a determination about whether appellant could present a claim against appellee prior to making any determination about class determination for the sake of judicial economy.

## PROCEDURAL AND FACTUAL BACKGROUND

Appellant's Complaint alleged that, on February 6, 2007, appellee prepared her 2006 Federal Income Tax Return. At that time, appellee assisted appellant in acquiring a Refund Anticipation Loan (RAL) from a lender, Santa Barbara Bank & Trust (SBBT) in anticipation of her income tax refund. Appellant asserted that she "indirectly paid" appellee for arranging the RAL "in that the credit that [appellee] obtained for her included in its principal amount the cost of obtaining this extension of credit." She further alleged that appellee included in "its principal amount fees charged by [appellee] for the preparation and filing of her federal income tax return." Appellant elected to use part of her RAL to pay appellee's tax preparation fee of $284.

Appellant alleged that appellee failed to obtain the required license from the Commissioner of Financial Regulation of the Department of Labor, Licensing & Regulation (the Commissioner) pursuant to C.L. § 14-902, failed to obtain a surety bond pursuant to Section 14-1908 and failed to provide her with numerous "documents and disclosures" required by Sections 14-1904, 14-1905 and 14-1906.

Appellee filed a Motion to Dismiss on the grounds that its actions in providing appellant with the RAL did not fall within the purview of the CSBA because she failed to establish that she was a "consumer" within the meaning of the CSBA and that she did not pay anything of value to appellee in exchange for receiving credit services.

On June 18, 2009, the circuit court held a hearing on appellee's motion to dismiss. On June 23, 2009, the circuit court filed a Memorandum Opinion and Order dismissing appellant's claims. Based upon appellant's Complaint, the circuit court determined:

[Appellant's] RAL application says that she expected a federal tax refund of $2,323, that she has requested a RAL from SBBT, and that the estimated amount of her loan disbursement is $1,950.97, net of loan and fees and the $284 tax preparation fee owed to [appellee]. The loan agreement

[appellant] entered into with SBBT is clear that it is for a loan in anticipation of her federal tax refund. In addition to [appellee's] tax preparation fee of $284, [appellant] agreed to pay SBBT a handling fee of $29.95 and prepaid finance charges of $58.08.

The circuit court initially examined appellant's claim under the CSBA and found that the definition of a "credit service business" in § 14–1901(e) and "consumer" in § 14–1901(c) were ambiguous; thus, it looked to the legislative history of the CSBA, which was enacted on May 14, 1987 as 1987 Md. Laws, ch. 469. The trial court examined the Fiscal and Policy Note, along with numerous documents in the bill file, and concluded that the General Assembly sought to regulate credit repair agencies by enacting the CSBA. Thus, the circuit court ruled:

> It is manifest that the reason why the General Assembly passed the CSBA was to protect unsuspecting Marylanders from credit repair agencies who offered to 'fix' their credit rating, or to obtain loans for the credit impaired customer, in exchange for a fee. The CSBA simply was neither intended nor designed to cover firms engaged in the business of selling goods or services to their customers, when such goods or services are not aimed at improving one's credit rating. Nor was it intended to cover the extension of credit by a third-party, not privy to the primary transaction, which is ancillary to the customer's purchase of the goods or services provided by the merchant.
>
> . . . .
>
> [Appellant] is [sic] this case neither had a contract with [appellee] in return for credit services nor a contract for the extension of credit. The documents appended to her complaint make it clear that her contract in this regard was with SBBT and that the fee she paid for the extension of credit was paid by her to SBBT. The only fee [appellant] was obligated to pay to [appellee] was the $284.00 she agreed to pay for the preparation of her income tax returns.
>
> . . . .

Count I will be dismissed for failure to state a claim. Additionally, because relief under count II is dependent upon a cognizable claim under Count I, it will be dismissed as well.

Thereafter, appellant noted an appeal to this Court. Additional facts shall be supplied *infra* as warranted.

## STANDARD OF REVIEW

The Court of Appeals recently reiterated the standard of review of a grant of a motion to dismiss a plaintiff's Complaint for failure to state a claim in *RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643, 994 A.2d 430 (2010).

Considering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted. *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 121–22, 916 A.2d 257, 264–65 (2007); *Sprenger v. Pub. Serv. Comm'n*, 400 Md. 1, 21, 926 A.2d 238, 249–50 (2007); *Pendleton v. State*, 398 Md. 447, 458–60, 921 A.2d 196, 203–04 (2007); *Converge Servs. Group, LLC v. Curran*, 383 Md. 462, 475, 860 A.2d 871, 878–79 (2004); *Fioretti v. Maryland State Bd. of Dental Exam'rs*, 351 Md. 66, 71–72, 716 A.2d 258, 261 (1998).

*Id.*

■■ In addition, we review the circuit court's interpretation of the CSBA *de novo*. *Herlson v. RTS Residential Block 5, LLC*, 191 Md.App. 719, 730, 993 A.2d 699 (2010) ("we review the Circuit Court's interpretation of the statute *de novo*.") (quoting *Gleneagles, Inc. v. Hanks*, 385 Md. 492, 496, 869 A.2d 852 (2005)). Thus, we are tasked with determining whether the circuit court erroneously interpreted the CSBA to pre-

clude appellant's claims against appellee, based upon the facts as pleaded by appellant in her Complaint, as a matter of law.

## LEGAL ANALYSIS

■ Appellant contends that the CSBA applies to "loan arrangers" such as appellee, based upon a reading of the plain language of the statute. Specifically, appellant posits that appellee falls within the plain language of the statutory definition of a "credit services business" and she falls within the definition of a "consumer" under C.L. § 14–1901. Alternatively, she argues that, if there is any ambiguity that requires an examination of the legislative history, the legislative history reveals that the General Assembly intended to target businesses like appellee.

Appellee counters that the plain language of the statute is unambiguous and Jackson Hewitt falls outside its purview. In addition, appellee claims that the legislative history confirms that the General Assembly did not intend for the statute to apply to Jackson Hewitt. Finally, appellee points out that, in May 2010, the General Assembly enacted a statute that specifically targets tax preparation businesses engaged in facilitating RALs, which undermines appellant's interpretation of the CSBA.

For the reasons that follow, we agree with appellee. The plain meaning of the language supports appellee's position and we think the legislative history undergirding the enactment of CSBA and subsequent amendments indicates that the General Assembly did not contemplate the statute's application to businesses such as Jackson Hewitt. The enactment of 2010 Md. Laws, ch. 730 further supports our interpretation of the CSBA. We explain.

### The Plain Language of the CSBA

Initially, appellant contends that the language of the CSBA plainly applies to "loan arrangers" such as appellee. The CSBA seeks to regulate "credit services businesses" by imposing licensing requirements, implementing disclosure require-

ments, providing for an administrative review process for complaints and providing monetary and criminal penalties for violations. Section 14–1901 provides, in pertinent part:

(c) Consumer.—"Consumer" means any individual who is solicited to purchase or who purchases for personal, family, or household purposes the services of a credit services business.

. . . .

(e) Credit services business.—

(1) "Credit services business" means any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services in return for the payment of money or other valuable consideration:

(i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record;

(ii) *Obtaining an extension of credit for a consumer*; or

(iii) Providing advice or assistance to a consumer with regard to either subparagraph (i) or (ii) of this paragraph.

(2) "Credit services business" includes a person who sells or attempts to sell written materials containing information that the person represents will enable a consumer to establish a new credit file or record.

(3) "Credit services business" does not include:

(i) Any person authorized to make loans or extensions of credit under the laws of this State or the United States who is actively engaged in the business of making loans or other extensions of credit to residents of this State;

(ii) Any bank, trust company, savings bank, or savings and loan association whose deposits or accounts are eligible for insurance by the Federal Deposit Insurance Corporation or any credit union organized and chartered under the laws of this State or the United States;

(iii) Any nonprofit organization exempt from taxation under § 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3));

(iv) Any person licensed as a real estate broker by this State where the person is acting within the course and scope of that license;

(v) Any person licensed as a mortgage lender by this State;

(vi) An individual admitted to the Bar of the Court of Appeals of Maryland when the individual renders services within the course and scope of practice by the individual as a lawyer and does not engage in the credit services business on a regular and continuing basis;

(vii) Any broker-dealer registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission where the broker-dealer is acting within the course and scope of that regulation;

(viii) Any consumer reporting agency as defined in the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681— 1681t) or in § 14–1201(e) of this title; or

(ix) An individual licensed by the Maryland Board of Public Accountancy when the individual renders services within the course and scope of practice by the individual as a certified public accountant and does not engage in the credit services business on a regular and continuing basis.

(Emphasis added).

Appellant argues that the statute defines a "credit services business" as any business that, in exchange for a fee on behalf of others, promises to (1) improve a "consumer's credit record, history, or rating or establishing a new credit file or record," obtain "an extension of credit for a consumer" *or* (3) provide "advice or assistance to a consumer" regarding improving credit or obtaining an extension of credit. Because the provision is written in the disjunctive, according to appellant, it is therefore plain that appellee, who obtains extensions of credit on behalf of its customers through RALs, falls within the purview of the CSBA and no further construction of the

statute is necessary. In addition, appellant points out that C.L. § 14–1901(e)(3) provides a list of exemptions from the category of "credit services business" and appellee, as a tax preparer who also facilitates RALs, does not fall within any of the enumerated exemptions. Thus, according to appellant, the trial court erred.

With regard to the issue generated in the trial court as to whether appellant is a "consumer" under the plain language of the statute, appellant maintains that the statute in no way suggests that a "consumer" is a person who pays the credit services business *directly*. C.L. § 14–1901(c) provides that a consumer is "any individual who is solicited to purchase or who purchases for personal, family, or household purposes the services of a credit services business." According to appellant, to imply that the statute requires her to pay appellee *directly* would impermissibly add terms to the statute and narrow its applicability.

In addition, appellant points to another provision of the statute, § 14–1906(a), which sets forth requirements for the contract between the credit services business and the consumers. Section 14–1906 provides:

(a) Requirements.—Every contract between a consumer and a credit services business for the purchase of the services of the credit services business shall be in writing, dated, signed by the consumer, and shall include:

(1) A conspicuous statement in size equal to at least 10–point bold type, in immediate proximity to the space reserved for the signature of the consumer as follows:

"You, the buyer, may cancel this contract at any time prior to midnight of the third business day after the date of the transaction. See the attached notice of cancellation form for an explanation of this right.";

(2) The terms and conditions of payment, including the total of all payments to be made by the consumer, whether to the credit services business *or to some other person;*

(Emphasis added).

Appellant contends that this language is an indication that the General Assembly expressly contemplated that a consum-

er falling within the ambit of the statute would make payments to third parties. Appellant adds that, if the General Assembly had intended to limit the class of consumers to which the statute applied to those who paid the credit services business directly, it would have included language to that effect. In support of this contention, appellant directs our attention to a similar Ohio statute, which was construed in *Snook v. Ford Motor Co.*, 142 Ohio App.3d 212, 755 N.E.2d 380, 383 (2001), wherein the Ohio Credit Services Organization Act formerly explicitly required payment to flow directly from the consumer to the credit services organization. A credit services organization was originally defined in the Ohio statute as "any person that charges or receives, *directly from the buyer*, money or other valuable consideration easily convertible into money, and that sells, provides, or performs, or represents that the person can or will sell, provide, or perform, any of the following services." *Id.* (quoting OHIO REV. CODE ANN. § 4712.01(C)(1)).

In 1999, the Ohio legislature amended the statute and OHIO REV.CODE ANN. § 4712.01(C)(1) (LexisNexis 2010) now provides: " 'Credit services organization' means any person that, in return for the payment of money or other valuable consideration readily convertible into money for the following services, sells, provides, or performs, or represents that the person can or will sell, provide, or perform, one or more of the following services...." Appellant argues that if the General Assembly intended to impose such a specific requirement, it would have included language similar to the language originally included in the Ohio statute.

Similarly, appellant directs our attention to the Federal Credit Repair Organizations Act (CROA). 15 U.S.C. § 1679a(3)(A) defines a "credit repair organization" as

any person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i).

█ Appellant points out that the CROA "contains the exact same 'in return for the payment of money or other valuable consideration'" language that the CSBA contains and cites several unreported trial court rulings interpreting the CROA and holding that a consumer need not pay the credit repair organization directly in order to fall within the CROA.[2]

The Commissioner of Financial Regulation (the Commissioner) and The Consumer Protection Division of the Office of the Attorney General of Maryland have together filed a Brief of *Amici Curiae* and add to appellant's plain language argument that there is no language in the statute that suggests that the CSBA is targeted at regulating the activities of "traditional credit repair services." Instead, *amici* argue that C.L. § 14–1901(e) applies to credit services businesses who either obtain an extension of credit for a consumer or who provide assistance in obtaining an extension of credit. Section 14–1901(f) defines an extension of credit as "the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes." *Amici* contend that, "when a consumer obtains an RAL, it is an extension of credit within the meaning of the statute because the consumer incurs a debt for which payment is deferred and the debt is 'primarily for personal, family, or household purposes.'"

Appellee counters that a reading of the plain language of the CSBA supports its contention that the CSBA does not apply in this case. Appellee argues that appellant did not purchase any services from Jackson Hewitt with respect to

---

**2.** We note that "[c]ounsel would be well served when relying on foreign unreported decisions, to refer the court to a local rule of the decision's jurisdiction of origin that would permit its citation in that jurisdiction." *Holloman v. Circuit City Stores, Inc.,* 162 Md.App. 332, 342 n. 5, 873 A.2d 1261 (2005).

the RAL and that it was undisputed that she did not make any payments to appellee, precluding a finding that she is a "consumer" within the meaning of the CSBA. Appellee explains that the only services that appellant purchased from Jackson Hewitt were tax preparation services, "the charge for which was not dependent upon her application for a RAL."

Appellee contends that appellant's interpretation of the CSBA attempts to insert language not present in the statute to re-define a "consumer" as a person who purchases the services of a credit services business *or who applies for a loan from a lender who, in turn, purchases the services of a third party.*"

Appellee posits that, reading the CSBA as a whole, it is plain that the General Assembly did not contemplate its application to businesses such as Jackson Hewitt, facilitating RALs. Appellee points out that C.L. § 14–1902(1) contemplates payment for credit services to come directly from the consumer. Section 14–1902(1) provides:

A credit services business, its employees, and independent contractors who sell or attempt to sell the services of a credit services business shall not:

(1) Receive any money or other valuable consideration *from the consumer,* unless the credit services business has secured from the Commissioner a license under Title 11, Subtitle 3 of the Financial Institutions Article;

(Emphasis added).

Appellee, like appellant, also directs us to C.L. § 14–1906(a)(2), which outlines contract requirements between the credit services business and the consumer and provides: "The terms and conditions of payment, including the total of all payments *to be made by the consumer,* whether to the credit services business or to some other person." (Emphasis added). Appellee contends that SBBT "purchased" its RAL services, not appellant.

With regard to the definition of "credit services business," appellee posits that appellant's argument also requires "re-

writing" the statute to define a credit services business as follows:

> any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide or perform, any of the following services ~~in return~~ for the payment of money or other valuable consideration *regardless of the source* ....

But, appellee argues, the words "in return" are present in the statute because the General Assembly contemplated the giving by one party of something of value in exchange for another thing of value from the other party and we cannot read the statute so as to render those words meaningless. Further, appellee contends, the words "regardless of the source" do not appear in the definition of a credit services business, suggesting that the General Assembly contemplated the source of payment to be the consumer.

Finally, appellee directs our attention to two unreported state trial court orders from trial courts in Missouri and Ohio in which the trial courts ruled that similar statutes in those states did not apply to appellee. These rulings, along with the ruling of the trial court in the case *sub judice*, appellee maintains, are consistent with the decision of the Supreme Court of Illinois in *Midstate Siding and Window Co., Inc. v. Rogers*, 204 Ill.2d 314, 273 Ill.Dec. 816, 789 N.E.2d 1248 (2003).

In *Midstate*, the Court was tasked with determining whether Midstate, a home improvement company, was a "credit services organization" under the Illinois Credit Services Act. Midstate contracted with the Rogers to install windows and siding on the Rogers' home. *Id.*, 273 Ill.Dec. 816, 789 N.E.2d at 1250–51. The Rogers, however, could not afford the full price of the windows and siding; thus, Midstate offered to assist the Rogers in obtaining financing. *Id.* The Rogers filled out a credit application that Midstate forwarded to a lending institution, which in turn, agreed to provide a home equity loan to the Rogers. *Id.* Midstate argued that the assistance with financing was a "gratuitous service." *Id.*, 273 Ill.Dec.

816, 789 N.E.2d at 1251. The Illinois Credit Organizations Act provided, in pertinent part:

"(a) 'Buyer' means an individual who is solicited to purchase or who purchases the services of a credit services organization.

. . .

(d) 'Credit Services Organization' means a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:

(i) improving a buyer's credit record, history, or rating[;]

(ii) obtaining an extension of credit for a buyer; or

(iii) providing advice or assistance to a buyer with regard to either subsection (i) or (ii)."

*Id.,* 273 Ill.Dec. 816, 789 N.E.2d at 1253 (quoting 815 ILL. COMP. STAT. ANN. 605/3(a), (d) (West 1996)).

The Court held that the Act did not apply to Midstate:

Looking to the definition of a "[b]uyer" and the definition of a "[c]redit [s]ervices [o]rganization," it is clear that the Credit Services Act regulates transactions involving the payment of money or other valuable consideration *in return* for the services of the credit services organization. In turn, the services of the credit services organization are "improving a buyer's credit record, history, or rating"; "obtaining an extension of credit for a buyer"; or "providing advice or assistance to a buyer" with regard to "improving a buyer's credit record, history, or rating" or with regard to "obtaining an extension of credit" for the buyer. 815 ILCS 605/3 (West 1996). Thus, the Credit Services Act requires payment for credit services, not simply payment for other goods or services.

*Id.*

The Court further concluded that "the contract at issue does not provide for payment of money . . . in return for credit services provided by Midstate. Instead the agreed consider-

ation is for payment of windows and siding...." *Id.,* 273 Ill.Dec. 816, 789 N.E.2d at 1254.

Finally, appellee asserts that, in considering the statute and all its provisions as a whole, it is "eminently clear" that the General Assembly intended that it apply to "traditional credit repair organizations" and not those who prepare tax returns and facilitate RALs. Appellee insists that the "duties" outlined in the statute "make no sense" when applied to businesses such as itself. Specifically, appellee points to § 14–1902(6) which provides that credit services businesses may not "[c]harge or receive any money or other valuable consideration prior to full and complete performance of the services that the credit services business has agreed to perform for or on behalf of the consumer." Appellee points out that the documents attached to appellant's complaint make clear that appellee did not charge or collect funds from appellant, who purchased an RAL from SBBT. By contrast, appellee argues, this provision is "entirely logical" when applied to a credit repair organization that promises to perform services to improve a credit rating or assist with obtaining credit that a consumer might not otherwise be able to do.

Similarly, appellee argues that C.L. § 14–1902(2), which provides that a credit services business may not "[r]eceive any money or other valuable consideration solely for referral of the consumer to a retail seller or to any other credit grantor who will or may extend credit to the consumer, if the credit extended to the consumer is substantially the same terms as those available to the general public," logically applies to prevent a credit repair agency from taking money "from an unwitting customer" simply for referring that consumer to a creditor whom the consumer could have contacted on his or her own.

Likewise, appellee points out that the provisions in C.L. § 14–1902(3) are inapplicable to RAL transactions. Section 14–1902(3) provides that a credit services business shall not

> [m]ake, or assist or advise any consumer to make, any statement or other representation that is false or mislead-

ing, or which by the exercise of reasonable care should be known to be false or misleading, to a consumer reporting agency, government agency, or person to whom the consumer applies or intends to apply for an extension of credit, regarding a consumer's creditworthiness, credit standing, credit capacity, or true identity.

Appellee explains that it made no statements regarding "a buyer's credit worthiness, credit standing, credit capacity or true identity" in arranging the RAL. On the other hand, appellee points out, the provision would certainly apply in the context of a credit repair agency's promise or solicitation regarding the improvement of a buyer's credit rating.

Next, appellee points to the disclosure requirements contained in C.L. § 14–1905, which are as follows:

(a) In general.—The information statement required under § 14–1904 of this subtitle shall include:

(1) An accurate statement of the consumer's right to review any file on the consumer maintained by any consumer reporting agency, and the right of the consumer to receive a copy of a consumer report containing all information in that file as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681g) and under § 14–1206 of this title;

(2) A statement that a copy of the consumer report containing all information in the consumer's file will be furnished free of charge by the consumer reporting agency if requested by the consumer within 30 days of receiving a notice of a denial of credit as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681j) and under § 14–1209 of this title;

(3) A statement that a nominal charge not to exceed $5 may be imposed on the consumer by the consumer reporting agency for a copy of the consumer report containing all the information in the consumer's file, if the consumer has not been denied credit within 30 days from receipt of the consumer's request;

(4) A complete and accurate statement of the consumer's right to dispute the completeness or accuracy of any item on the consumer contained in any file that is maintained by any consumer reporting agency, as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681i) and under § 14–1208 of this title;

(5) A complete and detailed description of the services to be performed by the credit services business for or on behalf of the consumer, and the total amount the consumer will have to pay for the services; and

(6) A statement that accurately reported information may not be permanently removed from the file of a consumer reporting agency.

(b) Additional requirements of licenses.—A credit services business required to obtain a license pursuant to § 14–1902 of this subtitle shall include in the information statement required under § 14–1904 of this subtitle:

(1) A statement of the consumer's right to file a complaint pursuant to § 14–1911 of this subtitle;

(2) The address of the Commissioner where such complaints should be filed; and

(3) A statement that a bond exists and the consumer's right to proceed against the bond under the circumstances and in the manner set forth in § 14–1910 of this subtitle.

Appellee contends that the foregoing disclosures apply in the context of a transaction through which a consumer is attempting to "shore up" his or her credit score and speak to what credit reporting agencies can or cannot do, but none of the disclosures are applicable to RAL transactions. According to appellee, "providing such information would likely confuse an RAL applicant or, worse yet, cause that applicant to believe that [appellee] thinks their credit needs improvement."

Appellee also maintains that neither C.L. 14–1906(a)(3) nor 14–1906(b) has any application to an RAL. Section 14–1906(a)(3) pertains to the required disclosures that must be present in the consumer contract and provides that the following must appear therein:

A complete and detailed description of the services to be performed and the results to be achieved by the credit services business for or on behalf of the consumer, including all guarantees and all promises of full or partial refunds and a list of the adverse information appearing on the consumer's credit report that the credit services business expects to have modified and the estimated date by which each modification will occur.

Appellee asserts that "this provision has no meaning with regard to Jackson Hewitt" because it has "no control over any financial institution's decision regarding refunding payments made from a consumer to the institution." Moreover, appellee avers, Jackson Hewitt does not provide the "types of credit services contemplated by the provision."

Similarly, appellee alleges that the "notice of cancellation" provision of C.L. § 14–1906(b), which provides, in pertinent part, that the contract must advise the consumer that he or she "may cancel this contract, without any penalty or obligation, at any time prior to midnight of the third business day after the date the contract is signed. . . ." Appellee states that an RAL is usually paid within forty-eight hours of the application; thus, a "three-day right of cancellation is nonsensical in the context of the purchase of a RAL . . . ."

Appellee postulates that, if we were to accept appellant's interpretation of the CSBA, "it would result in liability for numerous retailers operating in Maryland that facilitate credit applications on behalf of financial institutions because retailers often offer assistance to customers with applications for credit offered by third-party banks in exchange for compensation from banks." This, appellee contends, was clearly not the General Assembly's intent to reach so many businesses whose primary function is to sell a good or service.

Appellant's rejoinder is that, simply because some portions of the statute may be inapplicable to appellee, does not render the entire statute inapplicable. In addition, she adds, *Midstate, supra,* is distinct from the case *sub judice* because Midstate, unlike appellee, gratuitously arranged for financing

for its customers, unlike appellee who, appellant baldly asserts, relies upon RALs as "the most profitable aspect of its business."

We have been unable to locate any case construing the Maryland CSBA. The parties, however, have cited the decision of the Fourth Circuit in *H & R Block Eastern Enters. v. Raskin*, 591 F.3d 718 (4th Cir.2010) for various propositions.[3] Lest there be any doubt, we make clear that the Fourth Circuit did not make *any* determinations on the merits of the question of whether H & R Block, nor any party in appellee's business, could be considered a "credit services business" under the CSBA. The Fourth Circuit vacated the ruling of the District Court, which granted partial summary judgment on the grounds that portions of the CSBA were preempted by the National Bank Act (NBA). The Court explained that the trial court erred in assuming, *arguendo*, that the CSBA applied to H & R Block because, "[t]o conclude that the NBA preempts certain of the CSBA's provisions, as applied to Block, without first assessing whether the CSBA actually applies to Block, amounts to 'seeking out conflicts ... where none clearly exists.'" *Id.* at 723 (quoting *College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir.2005)). The Court expressed no opinion whatsoever on the merits of whether H & R Block, who engaged in similar transactions with RALs, was a "credit services business."

Finally, immediately preceding oral argument in the case *sub judice*, appellant submitted to this Court the decision of the Supreme Court of Appeals of West Virginia, *Harper v. Jackson Hewitt, Inc.*, 227 W.Va. 142, 706 S.E.2d 63 (2010). The certified questions presented to the West Virginia appellate court were:

---

**3.** Appellee argues that the Fourth Circuit somehow expressed doubt as to whether H & R Block, a company offering similar RAL in addition to tax preparation services, qualified as a "credit services business" under the CSBA. Appellant relies upon the District Court's ruling as to whether some of the provisions of the CSBA were preempted by the National Bank Act, which the Fourth Circuit vacated in *Raskin, supra*.

Does a tax preparer who receives compensation either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meet the statutory definition of a credit services organization under [the credit services statute]?

Do the borrowers in a refund anticipation loan transaction meet the definition of a buyer [consumer] under [the credit services statute]?

*Id.* at 68.

The West Virginia Supreme Court of Appeals, in *Harper*, concluded

[w]hen we read the plain and unambiguous terms of § 46A–6C–2(a), we find that the first reformulated certified question is easily answered ... [T]he broad sweeping language contained in the statute leads us to no other possible conclusion. Accordingly, we find that a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a RAL meets the statutory definition of a credit services organization under W. Va.Code § 46A–6C–2(a).

*Id.* at 71.

Positing that "the operative provisions of the credit services acts of West Virginia and Maryland are virtually identical," appellant asserts that the court's ruling amounts to a rejection of the following: "that consumers have no claim because the operative RAL agreement is between Jackson Hewitt and the lending bank; that a direct payment from the consumer to Jackson Hewitt is required; that the [West Virginia] statute is intended to apply only to credit repair companies; that a parade of horribles would ensue if the [West Virginia] statute were found to apply to Jackson Hewitt's RAL business; and, that RAL borrowers are not "consumers" ["buyers" under the W. Va. terminology] as defined by the Act."

Appellants further rely on the *Harper* Court's conclusion that, "based upon the broad language of the [West Virginia] statute ... plaintiffs likewise qualify as 'buyers' under [the

West Virginia statute] because they purchased, whether indirectly or directly, the services of a credit services organization." *Id.* at 72.

Refuting appellant's claim that the *Harper* decision is a rejection of the aforementioned bases on which the circuit court relied in the case *sub judice*, appellees rejoin that the *Harper* Court simply disregarded the numerous references in W. VA. CODE § 46A–6C–6(a)(1), § 46A–6C–2(a)(2) and § 46A–6C–2(a)(3) to "conduct *on behalf of* or *for*" a consumer and wrongly, according to appellees, determined that the West Virginia legislature could have expressly provided that only "those who receive direct consumer payments be covered by the CSOA." Given that W. VA. CODE § 46A–6C–3(1) and (2) prohibits a credit services organization from "[c]harg[ing] a buyer or receiv[ing] *from a buyer* money or other valuable consideration before completing" credit services or solely for referring a buyer to a retail seller of credit, it is unclear, appellees maintain, "how the Court could have reached this decision." (Emphasis in original). Appellees also point out that, unlike the legislative history available in Maryland, the West Virginia Court was also hampered by the lack of any dispositive legislative history. Moreover, appellees contend, the *Harper* Court, given the decision as a whole, did not address their arguments regarding the absurd results that would apply.

Appellees' second rejoinder is that, contrary to appellant's argument that the *Harper* Court relied on the "plain and unambiguous terms" of the credit services organization act to reach its decision, the Court, in footnote 12, expressly "encourages the West Virginia legislature to amend the provisions of [the credit services organization act] *to provide a clarification of the CSOA*" regarding whether it should apply to entities like *Jackson Hewitt. Harper, id.* at 72, n. 12 (emphasis supplied by appellee). If, as appellant argues, the West Virginia credit services organization act were unambiguous, appellees maintain that "there would be no need for the Legislature to clarify it to avoid the absurd results that the West Virginia Supreme Court undoubtedly recognizes."

Finally, appellees point out that the Court, in *Harper*, in contrast to the circuit court, did not have the benefit of the legislative history of West Virginia's Corresponding Credit Services Organization Act. That, from the legislative history, the Maryland General Assembly intended that the CSBA apply only to the practices of unscrupulous businesses that, in exchange for a fee paid by the consumer, the companies would agree to assist such consumers with obtaining credit, improve credit records or offer advice on credit issues, is evident.

This is a case of first impression in Maryland. In interpreting a statute, "[o]ur predominant mission is to ascertain and implement the legislative intent, which is to be derived, if possible, from the language of the statute (or Rule) itself." *Downes v. Downes*, 388 Md. 561, 571, 880 A.2d 343 (2005) (citations omitted). If the language is unambiguous, we do not ordinarily look beyond the language of the statute. *Opert v. Criminal Injuries Compensation Bd.*, 403 Md. 587, 593, 943 A.2d 1229 (2008) (citations omitted). When examining the language of a statute, we must consider its meaning in context by evaluating the statute as a whole. *Kaczorowski v. Mayor & City Council*, 309 Md. 505, 514, 525 A.2d 628 (1987); *In re Stephen K.*, 289 Md. 294, 298, 424 A.2d 153 (1981).

While appellant's argument regarding the definition of "credit services business," based upon the disjunctive wording of Section 14–1901(e) has appeal, it overlooks the language recognized by the *Midstate* Court that contemplates that a consumer would pay the credit services business for improving the consumer's credit record, obtaining an extension of credit or providing advice or assistance in that regard. Like the Illinois statute, the CSBA defines a credit services business as "any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services *in return* for the payment of money or other valuable consideration...." C.L. § 14–1901(e)(1). The words "in return" suggest that the business to which the statute applies will receive payment from the consumer for the credit services, here, the extension of credit. Like Midstate,

appellee sells a service—income tax preparation—and that is the only service that appellant paid appellee to perform.

Although we believe that the plain meaning of the language resolves the issue before this Court, we may look to the legislative history. The Court of Appeals has opined:

"In the interest of completeness, however, we may look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946, 950 (1993). *See also Robey v. State,* 397 Md. 449, 454, 918 A.2d 499, 502 (2007); *Stanley v. State,* 390 Md. 175, 185, 887 A.2d 1078, 1084 (2005). In other words, the resort to legislative history is a confirmatory process; it is not undertaken to seek contradiction of the plain meaning of the statute. *Robey,* 397 Md. at 454, 918 A.2d at 502; *Stanley,* 390 Md. at 185, 887 A.2d at 1084. In such instances, we may find useful the context of a statute, the overall statutory scheme, and archival legislative history of relevant enactments. *Robey,* 397 Md. at 454, 918 A.2d at 502.

*Kramer v. Liberty Prop. Trust,* 408 Md. 1, 19, 968 A.2d 120 (2009) (quoting *Smith v. State,* 399 Md. 565, 578–79, 924 A.2d 1175 (2007)).

### The Legislative History of the CSBA

The CSBA was enacted through the passage of House Bill 472 in 1987. The Statement of Purpose in 1987 Laws of Md., ch. 469 provides:

FOR the purpose of providing certain protections to the consumers of credit services business; requiring credit services businesses to provide certain information to customers; establishing certain requirements for contracts between credit services businesses and consumers; requiring a surety bond or trust account in certain circumstances; defining certain terms; providing certain civil and criminal penalties; providing administrative remedies; providing certain limitation periods; making provisions of this Act

severable; and generally relating to the regulation of credit services businesses.

Although the Statement of Purpose does not shed light on what the General Assembly considered to be a "credit services business," additional documents in the bill file make clear that the General Assembly enacted the CSBA in response to concerns about predatory practices and misleading advertising of "credit repair organizations." In a House of Delegates Floor Report on House Bill 472, the "Background" section provides:

> Proponents claim that some credit services businesses, or *'credit repair agencies'* have engaged in unfair and deceptive practices. They claim that the agencies frequently cannot deliver the services offered, or the services offered are such that they can be performed by the customer with little effort. According to the commissioner of consumer credit, there are at least six credit *repair agencies* operating in this state. The agencies are subject to the consumer protection act, but are not otherwise regulated.

(Emphasis added).

 This confirms that, in enacting the CSBA, the General Assembly intended to target "credit repair agencies." In other words, the legislature sought to regulate those in the business of claiming to offer services to improve a consumer's credit or otherwise extending credit in exchange for a fee paid by consumers. As we see it, this language denotes an intent, on the part of the legislature, to regulate companies in the business of improving or extending credit, particularly those that over promise and mislead consumers [4] and not companies, such as appellee, who are in the business of tax preparation and offer to send business to a third party for a loan, without receiving a fee from the consumer.

---

4. This is also supported by multiple newspaper articles in the bill file decrying the practices of credit repair agencies that improperly lead consumers to believe that they can offer a "quick fix" to credit problems and rehabilitate poor credit records.

Appellee also directs our attention to documents contained in the bill file for House Bill 1242, which was enacted by 1990 Md. Laws, ch. 669 and increased penalties for violations of the CSBA. The Statement of Purpose in 1990 Md. Laws, ch. 669 provides:

FOR the purpose of making any credit services business who willfully fails to comply with certain requirements liable for a monetary award in a certain amount; increasing a certain penalty; and generally relating to the Maryland Credit Services Business Act.

The 1990 enactment provided for "a monetary award equal to 3 times the total amount collected from the consumer, as ordered by the Commissioner" in C.L. § 14–1912(a)(2) and added the possibility of imprisonment as a penalty for a violation in C.L § 14–1915(a). In the House Economic Matters Committee's "Bill Analysis" of House Bill 1242, similar evidence of legislative intent to regulate "credit repair businesses" is evident. It provides:

The Maryland Credit Services Businesses Act was enacted in 1987 and *regulates persons who provide credit repair services.* Currently, a violation of the Act is a misdemeanor with a fine of up to $5,000. Current civil penalties include compensation for actual damages and punitive damages allowed by the court, and attorney [sic] fees and court costs in any successful action under the Act. According to the Commissioner of Consumer Credit, the additional civil and criminal penalties are necessary to insure broader compliance with the Act. The Commissioner's Office reports that several *credit repair business[es]* have operated in the state in violation of the bonding and trust account provisions.

(Emphasis added). Identical language is found in a Floor Report on House Bill 1242. We think these are all indications that the General Assembly understood its original 1987 enactment of the CSBA to be for the purpose of regulating credit repair agencies who take fees from consumers to improve or extend credit, or to give advice or assistance in such matters.

### The 2001 and 2002 Amendments

Appellant and *amici* maintain that our reading of the legislative history should not so narrowly apply the CSBA and, specifically, we should accord to the amendments made in 2001 and 2002, an intent by the General Assembly, to regulate transactions involving third-party lenders.

In 2001, the General Assembly enacted Senate Bill 882,[5] which amended C.L. § 14–1902, by adding to the list of prohibitions for credit services businesses, an eighth item: credit services business may not "subject to the provisions of subsection (b) of this section, assist a consumer to obtain an extension of *unsecured closed end credit* at a rate of interest which, except for federal preemption of State law, would be prohibited under Title 12, Subtitle 1, 3 or 10 of this Article." 2001 Md. Laws, ch.630. It also created a new subsection. Subsection (b) defined a "payment instrument" as a "check or a draft ordering a person to pay money" and a "money order." It also provided that "an extension of unsecured closed end credit includes an extension of credit for which a payment instrument is held to ensure payment." 2001 Md. Laws, ch. 630.

The newly created subsection (b) also provided for the establishment of a Short–Term Small Consumer Loan Study Commission, made up of various legislators and representatives of the credit industry and consumer advocates, for the purpose of determining "the need for short-term, small consumer loans," to "identify the reasons why traditional lenders may not be fully meeting the need for short-term, small consumer loans in the State," to "evaluate alternatives to help meet the need for short-term small consumer loans" and to report to the General Assembly and make a recommendation and proposal for legislation if necessary. 2001 Md. Laws, ch. 630.

*Amici* cites a letter in the bill file for Senate Bill 882 from then Assistant Attorney General Robert A. Zarnoch, now a

---

5. Senate Bill 882 was cross-filed as House Bill 973.

judge on this Court, dated March 19, 2001. In his letter, Judge Zarnoch, writing in his capacity as Counsel to the General Assembly, explained that he wrote in response to a request for advice as to whether the proposed legislation "is preempted by or in conflict with federal law." He concluded that, in his view, the legislation "is not preempted by or in conflict with federal laws regulating national banks and federal savings and loan associations." In describing the purpose of the legislation, Judge Zarnoch wrote: "The legislation is primarily aimed at 'payday loans' and particularly, third party arrangements that some federally-insured depository institutions, such as national banks and federal savings and loan associations, have entered into with local agents (usually a check cashing business) to broker such loans." (Footnote omitted). The letter went on to conclude that, in his opinion, regulating third-party facilitators, such as those involved in "pay day loans," did not conflict with and was not preempted by federal law. *Amici* state that "this letter, which was considered contemporaneously by legislators who enacted the 2001 amendment to the CSBA, highlights the well-understood application of the Act to arrangers of consumer credit unrelated to credit repair services." *Amici* also points to other forms of testimony in the bill file that echo a consistent understanding of the bill and the application of the CSBA to "arrangers" of loans through third-party lenders.

The following year, the General Assembly once again amended Section 14–1902 through House Bill 1193. The Statement of Purpose was amended to provide

FOR the purpose of prohibiting a credit services business, its employees, and certain independent contractors from assisting a consumer to obtain an extension of credit at a rate of interest which, except for federal preemption of State law, would be prohibited under certain provisions of law governing credit regulation. . . .

Section 14–1902 was thus amended to remove subsection (b) in its entirety and instead, Section 14–1902 was amended to provide that a "credit services business, its employees, and independent contractors who sell or attempt to sell the ser-

vices of a credit services business shall not ... (8) Assist a consumer to obtain an extension of credit at a rate of interest which, except for federal preemption of State law, would be prohibited under Title 12 of this article." 2002 Laws of Md. 561.

*Amici* assert that, after the enactment of the 2001 amendment, the General Assembly failed to achieve its legislative purpose of regulating payday lending completely; thus, the General Assembly passed House Bill 1193, enacted as 2002 Md. Laws, ch. 561. *Amici* cites, in support of this contention, the Senate Finance Committee Summary of House Bill 1193, which provides: "This Bill expands the prohibition that was enacted last year which applies to extensions of *unsecured* closed end credit. Accordingly, this Bill applies to *any* extension of credit."

*Amici* also cite written testimony of the Commissioner of Financial Regulation in support of House Bill 1193, in which the Commissioner opined:

[House Bill 1193] would attempt to prohibit payday loans being offered in Maryland by third party agents of lenders. Last year the General Assembly passed SB 882 which attempted to achieve this result. Amendments to that bill resulted in its failure in fact to prevent payday lending as intended.

During the interim, a payday lender who is the agent of a third party lender has begun doing substantial business in Maryland. This bill would prohibit the activities now being conducted by that agent and should achieve the results the legislature intended last year.

Appellant and *amici* contend that the foregoing is evidence that the General Assembly was fully aware that the CSBA applied to businesses that assist consumers in obtaining credit, no matter what the purpose or intent of that loan.

While these amendments and the legislative history surrounding their enactment indicate that the General Assembly intended to regulate credit services businesses who use third-party lenders with higher interest rates than permitted by

Maryland law, we are not persuaded that the amendments or the legislative history indicate that the General Assembly ever contemplated regulating a business engaged in income tax return preparation that acts as a facilitator to permit a customer to pay a third party for a RAL.

### The Commission's Advisory Notice

 Appellant and *amici* contend that two Advisory Notices issued by the Commissioner of Financial Regulation support their contention that the CSBA has always applied to tax preparers who facilitate RALs. On January 24, 2005, the Commissioner issued an Advisory Notice providing the following warning to tax preparers:

> This tax season, you are reminded that if you are assisting Maryland consumers to obtain short term loans, whether secured by the consumers' anticipated tax refund or not and you receive compensation in return, you are in fact, operating as a credit services business as defined in Commercial Law Article, § 14–1901(b), Maryland Annotated Code. Anyone who offer [sic] these short term loans, refund anticipation loans ("RALs"), through a third party, must be licensed as a credit services business. . . .

Then, on May 15, 2008, the Commissioner issued the following Advisory Notice:

> . . . The purpose of this Advisory is to clarify the applicability of the Act to certain parties in light of applicable federal law (the National Bank Act and the Home Owner's Loan Act) and relevant case law interpreting those statutes.
>
> The act Applies to all businesses (except those specifically excluded from coverage under the law) that assist consumers in obtaining extensions of credit. The Commissioner has interpreted this law to include businesses that assist consumers in obtaining loans from federally insured national banks or thrifts. The Commissioner has also interpreted the Act to apply to tax preparers who are compensated in any matter (either by the consumer or the lender) to assist consumers in obtaining RALs from third-party lenders.

. . . .

Consistent with the foregoing, the Commissioner hereby exercises her enforcement discretion and concludes that the interest rate prohibition set forth in § 14–1902(8) of the Act will not be enforced against third-party agents of national banks or federally-chartered thrifts, when such agents are properly registered and regulated as electronic refund originators that assist consumers in obtaining RALs.

All other provisions of the Act continue to be applicable to, and will be enforced against tax preparers which facilitate RALs, even when such businesses act as agents of national banks or federally-chartered thrifts. . . .

Appellant and *amici* claim that the foregoing constitute "unequivocal public pronouncements confirming the Commissioner's interpretation of the statute" and that, pursuant to *Marriott Employees Fed. Credit Union v. Motor Vehicle Administration,* 346 Md. 437, 445, 697 A.2d 455 (1997), we should defer to the Commissioner's interpretation of the CSBA.

In *Marriott,* the Court of Appeals addressed when an agency's construction of a statute is entitled to deference. "The consistent and long-standing construction given to a statute by the agency charged with administering it is entitled to great deference . . . as the agency is likely to have expertise and practical experience with the statute's subject matter." 346 Md. at 445, 697 A.2d 455 (internal citation omitted). The Court opined:

The weight given an agency's construction of a statute depends on several factors—the duration and consistency of the administrative practice, the degree to which the agency's construction was made known to the public, and the degree to which the Legislature was aware of the administrative construction when it reenacted the relevant statutory language. *Magan v. Medical Mutual,* 331 Md. 535, 546, 629 A.2d 626, 632 (1993). Other important considerations include "the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation"

and "the nature of the process through which the agency arrived at its interpretation," with greater weight placed on those agency interpretations that are the product of adversarial proceedings or formal rules promulgation. *Balto. Gas & Elec. [Co. v. Public Service Commission ]*, 305 Md. [145] at 161–62, 501 A.2d [1307] at 1315 [ 1986) ]. An administrative agency's construction of the statute is not entitled to deference, however, when it conflicts with the unambiguous statutory language. *Falik v. Prince George's Hosp.*, 322 Md. 409, 416, 588 A.2d 324, 327 (1991). See generally 2A SINGER, supra, § 45.12.

*Id.* at 445–46, 697 A.2d 455.

*Amici* posit that the General Assembly has been aware, "at least since the 2001 session, that the Commissioner interprets the CSBA to require the licensing of entities that assist consumers in obtaining short term extensions of credit, whether they be payday loans or some other similar loan product." Thus, despite the fact that the interpretation is not the result of formal rule-making or an adversarial proceeding, the Commissioner's issuance of advisories and legislative testimony are entitled to deference because they have the "hallmarks of reasoned elaboration." [6]

---

**6.** *Amici* argue that the reasoning of the Office of the Attorney General also supports its interpretation of the CSBA, citing 79 Op. Atty. Gen. 98 (1994). In that opinion, the Attorney General addressed a question posed by the Deputy Secretary of Licensing & Regulation as to "whether a home improvement contractor is required to obtain an installment loan license as a prerequisite to offering its customers financing for home improvement projects" and "whether there are circumstances under which a home improvement contractor might need a mortgage lender's license if the offered financing is secured by a lien on the homeowner's residence." *Id.* at 98. We agree with appellee that, because the Attorney General was addressing a substantially different set of facts and interpretation of the CSBA was not the issue in the opinion, the Attorney General's comment that, if a contractor receives compensation for a referral of a secured or unsecured loan, it would be required to obtain a license as a "credit services business" under the CSBA is not compelling or entitled to significant weight. Moreover, the very next sentence of the opinion provides that "[t]he typical direct financing transaction, however, does not involve any compensation to the Contractor for referring the customer to the financing entity,"

Appellee counters that the Commissioner's interpretation has been inconsistent, it was not made contemporaneously with the enactment of the CSBA, it does not disclose the process by which the Commissioner interpreted the statute and it contains no cogent discussion or reasoned elaboration as to why the Commissioner so interpreted the statute in its two Advisory Notices.

■ Initially, we must address appellee's assertion that the Commissioner has taken inconsistent positions. The basis for appellee's claim is that, despite the position stated in both Advisory Notices, the Commissioner took an inconsistent position in litigation of an action for declaratory judgment brought by H & R Block, which we discussed in *Raskin, supra.* Appellee contends that the Commissioner stated, in the course of that litigation, that it held a meeting for the purpose of determining *whether* H & R Block is, in fact, subject to the CSBA for its involvement in RAL facilitation. To the extent that this position is inconsistent, we do not perceive it to be the kind of inconsistent position calling for less deference contemplated by the Court of Appeals in *Marriott, supra.* Notwithstanding that fact, we agree with appellee that the Commissioner's interpretation is not entitled to great deference in this case.

We reject the assertion of appellant and *amici* that the General Assembly has been aware of the Commissioner's interpretation of the CSBA as applying to those involved with facilitating RALs since 2001. We think it plain that the *only* "loan arrangers" contemplated in the legislative history cited were pay day lenders. Thus, at the earliest, the Commissioner's position with regard to RALs was first publicly stated in 2005 with its first Advisory Notice. The Advisory Notices, we are persuaded, fail to disclose the methods that the Commissioner employed in interpreting the CSBA to apply to tax preparers involved with RALs. It is undisputed that this

---

indicating that the application of the CSBA was not the focus of the opinion. *Id.* at 101.

interpretation was not reached through any kind of adversarial process. Moreover, the interpretation, in our view, contradicts the plain language of the statute. Accordingly, the circuit court did not err in failing to accord great deference to the Commissioner's interpretation.

### *The Recent Enactment of 2010 Md. Laws, ch. 730 Supports The Construction Herein of the CSBA*

Notably, with regard to the claim that the General Assembly was aware of the Commissioner's interpretation of the statute in its Advisory Notices, during the 2010 Session, the General Assembly enacted 2010 Md. Laws, ch. 730, which created a new subtitle in Section 14 of the Commercial Law Article specifically aimed at regulating tax preparers involved in facilitating RALs to be codified as C.L. § 14–3801, 14–3802, 14–3803, 14–3804, 14–3805, 14–3806 and 14–3807. 2010 Md. Laws, ch. 730. The Statement of Purpose provides:

FOR the purpose of prohibiting certain persons from soliciting the execution of, processing, receiving, or accepting an application or agreement for a refund anticipation loan or refund anticipation check or facilitating the making of a refund anticipation loan or refund anticipation check under certain circumstances; requiring a facilitator of a refund anticipation loan or refund anticipation check to display a certain schedule of fees in a certain manner; requiring the schedule to contain certain information and disclosures; prohibiting a facilitator from charging certain fees; requiring a facilitator to make certain written and oral disclosures to certain consumers at a certain time and in a certain manner; requiring the annual percentage rate for a refund anticipation loan to be calculated using certain guidelines; prohibiting a facilitator from taking certain actions relating to a refund anticipation loan or refund anticipation check; providing that, under certain circumstances, a certain provision of this Act does not prohibit a charge or fee from being imposed by a facilitator; providing that a violation of this Act is an unfair or deceptive trade practice under the

Maryland Consumer Protection Act and is subject to certain enforcement and penalty provisions; establishing certain additional penalties for a willful failure to comply with this Act; defining certain terms; and generally relating to refund anticipation loans and refund anticipation checks.

C.L. § 14–3806(b) provides:

Subsection (a)(2) of this section[7] does not prohibit a charge or fee, *including a fee for tax return preparation,* that is imposed by a facilitator on all of its customers if the same charge or fee, in the same amount, is imposed on customers who do not receive refund anticipation loans, refund anticipation checks, or other tax-related financial products.

Pellucidly, the above section expresses the legislature's approbation for the charging of a fee by the facilitator, and, in doing so, specifically sanctions "a fee for tax" preparation, so long as the facilitator (in this case the tax preparer), charges a fee in the same amount that other customers, who do not receive refund anticipation loans, refund anticipation checks, or other tax related financial products, must pay. C.L. § 14–3806(b) is clearly an attempt on the part of the legislature to clarify appellee's right to charge a fee for the tax return preparation service it renders, provided that the fee it receives from the customer does not exceed that which is charged to customers who do not receive refund anticipation loans, refund anticipation checks, or other tax related financial products. In the absence of evidence that the facilitator received payment in excess of that charged for preparing the consumer's tax return, such payment is not in violation of the clarifying legislation, *i.e.,* C.L. § 14–3806(b).[8]

---

**7.** Subsection (a)(2) states that "A facilitator may not: (2) Charge any fee to a consumer or require any other consideration for making or facilitating a refund anticipation loan or refund anticipation check other than the fee imposed by the creditor or other person that provides the refund anticipation loan or refund anticipation check."

**8.** We recognize that we may not divine the legislative intent undergirding the enactment of the CSBA through hindsight, *i.e.,* factoring the

The Fiscal and Policy Note expressly acknowledges the Commissioner's Advisory Notice in the "Current Law/Background" section: "On May 15, 2008, the Commissioner of Financial Regulation issued an advisory notice on the application of the Maryland Credit Services Business Act (MCSBA) to tax preparers that facilitate refund anticipation loans...." Although not expressly rejecting the Commissioner's interpretation, it appears that the General Assembly's decision to create the new provisions was prompted by the Commissioner's erroneous interpretation of the CSBA because it enacted provisions that expressly define refund anticipation loans and the roles that facilitators of those loans play, provide for disclosures to the consumer, prohibit specific acts relating to fees and misrepresentations and provide that a violation is an unfair or deceptive trade practice under the Maryland Consumer Protection Act, subject to the MCPA's civil and criminal penalty provisions. While this enactment does not provide the basis for our construction of the CSBA, we believe it

---

enactment of the clarifying legislation into our analysis. Accordingly, our determination of what constitutes a "credit services business" under the CSBA devolves upon the plain meaning of the language of the statute as well as the legislative history as explicated, *supra*. In light of the uncertainty as to whether tax preparers involved in RALs were intended to be covered by § 14–1901 of the CSBA, we find consonant with our determination, the fact that the legislature deemed it propitious to enact C.L. § 14–3806(b). In *Harper v. Jackson Hewitt, Inc., supra,* the recent decision of the West Virginia Supreme Court of Appeals heavily relied upon by appellant and amici regarding the pivotal issue of whether *indirect* payments to a tax preparer were violative of the West Virginia statute, the Court reasoned that the West Virginia legislature *could have* expressly provided that only "those who receive direct consumer payments be covered by the CSOA." (Emphasis added). The Court, having rendered a cursory disposition of the issue, obviously concerned that the statute needed clarification—notwithstanding its unequivocal decision, "encouraged" the West Virginia legislature to provide a clarification of the CSOA to explicate the application, *vel non*, of the CSOA to entities like Jackson Hewitt. The clarification enacted by the Maryland legislature, C.L. § 14–3806(b), directly addresses both direct *and indirect* payments to the tax preparer by simply prohibiting tax preparers from charging fees to their clients who obtain RALs that do not exceed fees charged to clients who do not obtain RALs.

further supports our interpretation of the General Assembly's intent with regard to the CSBA.

**JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

