46 A.3d 443

**Alicia GOMEZ**

v.

**JACKSON HEWITT, INC.**

**No. 72, Sept. Term, 2011.**

Court of Appeals of Maryland.

June 22, 2012.

130

Jonathan R. Krasnoff, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, W. Thomas Lawrie and William D. Gruhn, Asst. Attys. Gen., Baltimore, MD), on brief, for Petitioner.

Paul A. Solomon (Richard L. Brusca of Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, D.C.), on brief, for Respondent.

Argued before BELL, C.J., HARRELL, GREENE,*
ADKINS, BARBERA, DALE R. CATHELL (Retired,
Specially Assigned) and JAMES A. KENNEY, III (Retired,
Specially Assigned), JJ.

KENNEY, J.

Petitioners, the Maryland Commissioner of Financial Regulation of the Department of Labor, Licensing & Regulation ("the Commissioner") and the Consumer Protection Division of the Office of the Maryland Attorney General ("the Division") have intervened in this case to challenge the ruling of the Circuit Court for Montgomery County granting the motion

---

* Adkins, J., participated in the hearing and conference of this case, but recused prior to the adoption of this opinion.

of respondent, Jackson Hewitt, Inc., to dismiss a complaint for failure to state a claim.[1] The Court of Special Appeals affirmed in *Gomez v. Jackson Hewitt, Inc.*, 198 Md.App. 87, 16 A.3d 261 (2011). On October 24, 2011, this Court granted certiorari.[2] *Gomez v. Jackson Hewitt, Inc.*, 422 Md. 352, 30 A.3d 193 (2011). In their brief, petitioners present two questions, which we have modified slightly and condensed into one:

> Does the Maryland Credit Services Businesses Act ("the CSBA") apply to a tax preparer who receives payment from a lending bank for "facilitating" a consumer's obtention of a refund anticipation loan ("RAL"), where the tax preparer receives no direct payment from the consumer for this service?

For the reasons that follow, we shall affirm.

## FACTS AND PROCEDURAL BACKGROUND

According to the February 4, 2009 complaint, respondent

---

1. The complaint was filed by Alicia Gomez, and she appealed the Circuit Court's decision to the Court of Special Appeals. The Commissioner and the Division supported that appeal as *amici curiae*. Gomez later filed a petition for a writ of certiorari to this Court, and the Commissioner and the Division filed a joint motion to intervene and their own joint petition for a writ of certiorari. The petitions for certiorari and the motion to intervene were granted. The Commissioner and the Division jointly filed briefs before this Court, but Gomez did not.

2. This Court granted certiorari to consider the following questions:

 (1) Was the lower court wrong to conclude that the MD Credit Services Business Act (Act) requires a direct payment from the consumer to the loan arranger and therefore petitioner did not state a claim?

 (2) Was the lower court in error in finding that the General Assembly did not intend the usury amendment or the Act in general to apply to a refund anticipation loan arranger like respondent because it does not perform credit repair?

 (3) Did [sic] lower court err when it stated or implied that the Act applies only to credit repair companies & to businesses that arrange loans for consumers using third-party lenders with higher interest rates than permitted under MD law?

 (4) Did the lower court err in suggesting that the Act only applies to credit services business arrangements in which businesses receive money or other valuable consideration directly from the consumer?

prepared Gomez's 2006 federal income tax return,[3] and "obtained an extension of credit for ... Gomez in the form of a RAL[4] from [a] lender," Santa Barbara Bank & Trust ("SBBT"), "in anticipation of her income tax refund." Attached to the complaint were six pertinent documents: (1) the 8–K filing to the United States Securities and Exchange Commission filed by Jackson Hewitt Tax Service Inc.; (2) a "Program Agreement" between SBBT and respondent; (3) a "Technology Services Agreement" between SBBT and Jackson Hewitt Technology Services Inc. ("JHTSI"); (4) the "Taxpayer Information Form," produced by the franchisee of respondent that prepared Gomez's tax return; (5) the RAL "Application and Agreement," between SBBT and Gomez; and (6) the RAL "Truth–in–Lending Act (TILA) Disclosure Form," produced by SBBT.[5]

According to the 8–K,

Under the SBBT Program Agreement, SBBT will offer, process and administer certain financial products, including RALs, to customers of certain of [respondent's] franchised and company owned Jackson Hewitt Tax Service locations ("the SBBT Program"). In connection with the SBBT Program Agreement, SBBT will pay [respondent] a fixed annual fee. Pursuant to the SBBT Technology Services Agreement, JHTSI will provide certain technology services and related support in connection with the SBBT Program.

---

3. Respondent states, in its brief, that Gomez's return was prepared at "the office of an independently owned and operated franchisee of" respondent.

4. In her opposition to respondent's motion to dismiss the complaint, Gomez states that

 [a] RAL is a high interest loan, which [respondent] arranges through a lending bank ... and which it sells primarily to low income consumers at its offices. It is secured by the consumer's expected income tax refund and entitles the consumer to receive a tax refund roughly ten days sooner than the IRS would deliver it. For this marginally quicker access to the consumer's own money, RAL customers pay interest rates that range from 40 to 900 percent.

5. The 8–K acknowledges that respondent and JHTSI are each an "affiliate" of Jackson Hewitt Tax Service Inc.

Under the SBBT Technology Services Agreement, JHTSI will receive a fixed annual fee as well as variable payments tied to growth in the SBBT Program.

The Program Agreement specifically states that respondent "(i) is the franchisor of the Jackson Hewitt Tax Service® tax preparation system to independently owned and operated franchisees . . . and (ii) through Tax Service of America, Inc., a wholly owned subsidiary, owns and operates Jackson Hewitt Tax Service locations." It also provides:

> 6. **[Respondent's] Obligations and Procedures.** [Respondent] agrees, in connection with the operation of the [RAL] Program, to: (i) conduct such advertising; (ii) prepare forms and other written materials; (iii) cause its offices to be equipped with computer equipment and hardware; (iv) maintain personnel; (v) train such personnel and EROs [6] with respect to the Program Protocols; and (vi) take such other actions, in each case as reasonably necessary to advertise and accommodate the facilitation of Financial Products to Applicants at its expense, as well as the following specific duties:
>
> * * *
>
> **6.2 Application Process.** [Respondent] shall require participating EROs to require that each Applicant (i) complete and sign an application in a form developed by SBBT and reviewed by [respondent] prior to each Tax Season . . . which application may also include a loan agreement . . . and a disclosure statement meeting the requirements of the federal Truth–in–Lending Act. . . .

The Information Form indicates that Gomez had requested a RAL, lists $2,323.00 as her anticipated federal refund and $1950.97 as the "estimated amount of [her] RAL disbursement (this amount is net [of] all fees to be deducted from the loan and does not include any state refund amount . . .)," and

---

6. "EROs" stands for "electronic return originators," a term not defined in the Program Agreement.

states that she owes $284.00 "to [her] Jackson Hewitt Tax Service office" for tax preparation services.

The Application and Agreement explains that a "RAL is a loan from SBBT in the amount of all or part of your refund. Your refund is used to pay back the loan." To accomplish that, the borrowers

> authorize SBBT to receive your income tax refund(s) on your behalf and to make disbursements from your refund(s) as authorized by this Agreement. You authorize SBBT to establish a temporary deposit account (the "Account") in your name for the purpose of receiving a direct deposit of your refund.... If and when SBBT receives your income tax refunds, you authorize SBBT to deduct from your Account an SBBT tax refund handling fee and any other amounts, fees and charges authorized by this Agreement....

The Application and Agreement also states that "SBBT will pay compensation to [respondent] and an affiliate [7] ... in consideration of rights granted by [respondent] to SBBT and the performance of services by [respondent] on behalf of SBBT." [8]

The Disclosure Form reflects an "Annual Percentage Rate" of 85.089%, which is "[t]he cost of ... credit as a yearly rate." It also lists $2,323.00 as the "Total Loan Amount," which includes:

- $1,950.97 as the "[a]mount paid directly to you;"
- $284.00 as the "[t]ax preparation fees paid to" respondent;
- $29.95 as the "SBBT tax refund account handling fee;" and
- $58.08 as the "total prepaid finance charge (SBBT bank fee)."

---

7. The "affiliate" is not specified.

8. At oral argument, respondent's counsel stated that SBBT "has a contract with [respondent] to have access to [respondent's] customers to be able to offer ... loan products."

Asserting that respondent is a "credit services business" under the CSBA [9], the complaint reasons that Gomez "*indirectly* " paid respondent for arranging [10] the RAL, because the RAL "included in its principal amount" the $284.00 tax preparation fee, which the complaint describes as "the cost of obtaining this extension of credit[.]" [11] The complaint also reasons that respondent "received money from ... SBBT in connection with the extension of credit to" Gomez,[12] and alleges violations of the CSBA, Md.Code Ann., Com. Law ("CL"), § 14–1901 *et seq.* and the Maryland Consumer Protec-

---

**9.** Section 14–1901 of the CSBA states, in pertinent part:

(e) *Credit services business.*—(1) "Credit services business" means any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services *in return* for the payment of money or other valuable consideration:

(i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record;

(ii) Obtaining an extension of credit for a consumer; or

(iii) Providing advice or assistance to a consumer with regard to either subparagraph (i) or (ii) of this paragraph.

(Emphasis added.)

**10.** The complaint did not state precisely how respondent "arranges" or "facilitates" RALs. At oral argument, petitioners' counsel stated: "essentially, the customer walks in, gets his tax return done, and there is a solicitation of the customer, 'would you like a RAL? We can get it for you, you can go through our bank. We can do it, here are the forms, we can help you fill them out.' " In their reply brief, petitioners state that a RAL facilitator "advertises the product, solicits the consumer, and assists with completing the RAL application." Respondent's counsel described respondent's role in the RAL application process as "ministerial."

**11.** Respondent's motion to dismiss clarifies that Gomez did not pay the $ 284.00 fee to respondent up front; rather, that amount was directly taken out of the RAL disbursement made by SBBT to Gomez.

**12.** In their reply brief, petitioners state: "[t]he consumer pays fees to the bank for the RAL, and the bank then compensates its agent, the facilitator of the loan[.]" Gomez also states, in her opposition to respondent's motion to dismiss the complaint, that "any entity that is paid in exchange for assisting a prospective borrower to obtain a loan is a" credit services business, and "[w]hether its compensation comes directly from the [consumer] or in the form of a backdoor kickback from the [lender] bank is immaterial."

tion Act ("the CPA"), *id.* § 13–301 *et seq.*[13] More specifically, the complaint states that respondent failed: (1) "to obtain a license from the Commissioner . . . as is required by" § 14–1902 of the CSBA; (2) "to obtain a surety bond as required by" § 14–1908; and (3) "to provide [Gomez] with the documents and disclosures required by" §§ 14–1904 to –1906, "including but not limited to the buyer's rights and other disclosures" and "detachable copies of a notice of cancellation and a contract with the necessary inclusions."

Respondent moved to dismiss the complaint for failure to state a claim. It acknowledges that, "[i]n exchange for being permitted to offer its products in [respondent's] offices, in 2006 . . . [SBBT] agreed to pay [respondent] a fixed fee," but asserts that Gomez made a payment for the RAL *only* to SBBT and "did not pay anything of value to [respondent] in exchange for receiving credit services." Because respondent did not receive *direct payment* from Gomez for credit services, respondent asserts that she "failed to state a claim under the CSBA as a 'consumer' who purchased services from a 'credit services business.' " Respondent adds that Gomez's "interpretation of the CSBA would lead to absurd results in applying the statute to tremendous numbers of retailers throughout Maryland who have never registered under the CSBA."

On June 18, 2009, the Circuit Court held a hearing on the motion to dismiss, and on June 23, 2009, the court filed a Memorandum Opinion and Order. The court determined that the definitions "credit services business" in § 14–1901(e) and "consumer" in § 14–1901(c) of the CSBA were ambiguous "because the language can be read in a number of different ways." Turning to the legislative history, the court concluded that the General Assembly enacted the CSBA to regulate *credit repair agencies,* and not RAL facilitators:

---

13. The complaint states that respondent's alleged violations of the CSBA also constitute violations of the CPA. Section 14–1914 of the CSBA, entitled "Actions under Consumer Protection Act," states: "(a) *Each sale is offense.*—Each sale of the services of a credit services business that violates any provision of this subtitle is an unfair or deceptive trade practice under Title 13 of this article."

It is manifest that the reason why the General Assembly passed the CSBA was to protect unsuspecting Marylanders from credit repair agencies who offered to "fix" their credit rating, or to obtain loans for the credit impaired customer, in exchange for a fee. The CSBA simply was neither intended nor designed to cover firms engaged in the business of selling goods or services to their customers, when such goods or services are not aimed at improving one's credit rating. Nor was it intended to cover the extension of credit by a third-party, not privy to the primary transaction, which is ancillary to the customer's purchase of the goods or services provided by the merchant. . . .

[Gomez] is [sic] this case neither had a contract with [respondent] in return for credit services nor a contract for the extension of credit. The documents appended to her complaint make it clear that her contract in this regard was with SBBT and that the fee she paid for the extension of credit was paid by her to SBBT. The only fee [Gomez] was obligated to pay to [respondent] was the $284.00 she agreed to pay for the preparation of her income tax returns.

Accordingly, the Circuit Court dismissed the CSBA claim for failure to state a claim, and dismissed the CPA claim because it was "dependant upon a cognizable [CSBA] claim."

Gomez noted an appeal to the Court of Special Appeals. That court affirmed the Circuit Court, reasoning that

[t]he plain meaning of the [CSBA] . . . supports [respondent's] position and we think the legislative history undergirding the enactment of CSBA and subsequent amendments indicates that the General Assembly did not contemplate the statute's application to businesses such as [RAL facilitators].

*Gomez v. Jackson Hewitt, Inc.*, 198 Md.App. 87, 94, 16 A.3d 261, 265 (2011). The intermediate appellate court held, based on the analysis of an analogous credit services statute in *Midstate Siding & Window Co. v. Rogers*, 204 Ill.2d 314, 273 Ill.Dec. 816, 789 N.E.2d 1248, (2003), that

the words "in return" suggest that the business to which the [CSBA] applies will receive payment from the consumer for *credit services*, here, the extension of credit. Like Midstate, respondent "sells a service—income tax preparation—and that is the only service that [Gomez] paid [respondent] to perform."

*Gomez*, 198 Md.App. at 110–11, 16 A.3d at 275 (emphasis added).

The Court of Special Appeals's examination of the legislative history of the CSBA revealed that "all indications [are] that the General Assembly understood its original 1987 enactment of the CSBA to be for the purpose of regulating *credit repair* agencies who take fees from consumers to improve or extend credit, or to give advice or assistance in such matters." *Id.* at 113, 16 A.3d at 277 (emphasis added). As to the 2001 and 2002 amendments to the CSBA, the legislative history indicated that those amendments were "primarily aimed at 'payday loans,'" from which the court concluded that neither "the amendments [n]or the legislative history indicate that the General Assembly ever contemplated regulating a business engaged in income tax return preparation that acts as a facilitator to permit a customer to pay a third party for a RAL." *Id.* at 116–17, 16 A.3d at 277–78.

As to two Advisory Notices, dated January 24, 2005 and May 15, 2008, issued by the Commissioner and interpreting the CSBA to apply to RAL facilitators, the Court of Special Appeals determined that, under the standard for judicial deference to agency interpretations established in *Marriott Employees Fed. Credit Union v. Motor Vehicle Administration*, 346 Md. 437, 697 A.2d 455 (1997),

[t]he Advisory Notices ... fail to disclose the methods that the Commissioner employed in interpreting the CSBA to apply to tax preparers involved with RALs. It is [also] undisputed that this interpretation was not reached through any kind of adversarial process. Moreover, the interpretation, in our view, contradicts the plain language of the

statute. Accordingly, the circuit court did not err in failing to accord great deference to the Commissioner's interpretation.

*Gomez,* 198 Md.App. at 120–21, 16 A.3d at 281. The court was not persuaded by an opinion of the Office of the Attorney General, 79 Md. Op. Att'y Gen. 98 (1994), which it described as "addressing a substantially different set of facts" from those in the instant case, in which "application of the CSBA was not the focus. . . ." *Gomez,* 198 Md.App. at 119 n. 6, 16 A.3d at 280 n. 6.

Finally, "[i]n light of the uncertainty as to whether tax preparers involved in RALs were intended to be covered by § 14–1901 of the CSBA," the court said, "we find consonant with our determination, the fact that the legislature deemed it propitious to enact C.L. § 14–3806(b)," *id.* at 122 n. 8, 16 A.3d at 282 n. 8, part of new subtitle 38 in Section 14 of the Commercial Law Article (the "2010 RAL legislation"), which was "specifically aimed at regulating tax preparers involved in facilitating RALs." *Id.* at 121, 16 A.3d at 281. According to the court, this "clarif[ying]" legislation, enacted by 2010 Md. Laws, ch. 730, "directly addresses both direct *and indirect* payments to the tax preparer" by prohibiting tax preparers from charging fees to their clients who obtain RALs that exceed fees charged to clients who do not obtain RALs. *Id.* at 122 n. 8, 16 A.3d at 282 n. 8. As the court saw it, based on the legislative history,

> it appears that the General Assembly's decision to create the new provisions was prompted by the Commissioner's erroneous interpretation of the CSBA [as applying to RAL facilitators] because it enacted provisions that expressly define refund anticipation loans and the roles that facilitators of those loans play, provide for disclosures to the consumer, prohibit specific acts relating to fees and misrepresentations and provide that a violation is an unfair or deceptive trade practice under the [CPA]. . . . While this enactment does not provide the basis for our construction of

the CSBA, we believe it further supports our interpretation of the General Assembly's intent with regard to the CSBA.

*Id.* at 123–24, 16 A.3d at 282.

## DISCUSSION

### *Standard of Review*

 We review *de novo* both the grant of a motion to dismiss, *Reichs Ford Rd. Joint Venture v. State Rds. Comm'n of the State Highway Admin.*, 388 Md. 500, 509, 880 A.2d 307, 312 (2005), and the interpretation of a statute, *Gleneagles, Inc. v. Hanks*, 385 Md. 492, 496, 869 A.2d 852, 854–55 (2005). This Court has said,

> [c]onsidering a motion to dismiss a complaint for failure to state a claim upon which relief may be granted, a court must assume the truth of, and view in a light most favorable to the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them, and order dismissal only if the allegations and permissible inferences, if true, would not afford relief to the plaintiff, *i.e.*, the allegations do not state a cause of action for which relief may be granted.

*RRC Northeast, LLC v. BAA Md., Inc.*, 413 Md. 638, 643, 994 A.2d 430, 433 (2010) (citations omitted). The grant of a motion to dismiss may be affirmed on "any ground adequately shown by the record, whether or not relied upon by the trial court." *Parks v. Alpharma, Inc.*, 421 Md. 59, 65 n. 4, 25 A.3d 200, 203 n. 4 (2011) (citation omitted).

### *Legal Analysis*

Petitioners argue that both the "unambiguous" plain language of the CSBA and its legislative history support the application of the CSBA to respondent. They also cite other extrinsic aids, such as the 2010 RAL legislation, to support their argument.

According to the "well-recognized rules of statutory construction," *Brooks v. Hous. Auth.*, 411 Md. 603, 621, 984 A.2d 836, 846–47 (2009),

> [o]ur primary goal is " 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision[.]' " *Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 571, 948 A.2d 11, 18 (2008) (quoting *Barbre v. Pope*, 402 Md. 157, 172, 935 A.2d 699, 708 (2007)). We first look at the "normal, plain meaning of the language of the statute," *Anderson*, 404 Md. at 571, 948 A.2d at 18, and we read it as a whole so that " 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory[.]' " *[I]d.* (quoting *Barbre*, 402 Md. at 172, 935 A.2d at 708). "If the language of the statute is clear and unambiguous, we need not look beyond the statute's provisions and our analysis ends." *Id.* at 572, 948 A.2d at 19.

Section 14–1901 of the CSBA states in pertinent part:

(c) *Consumer.*—"Consumer" means any individual who is solicited to purchase or who purchases for personal, family, or household purposes the services of a credit services business.

\*　　\*　　\*

(e) *Credit services business.*—(1) "Credit services business" means any person who, with respect to the extension of credit by others, sells, provides, or performs, or represents that such person can or will sell, provide, or perform, any of the following services *in return* for the payment of money or other valuable consideration:

(i) Improving a consumer's credit record, history, or rating or establishing a new credit file or record;

(ii) Obtaining an extension of credit for a consumer; or

(iii) Providing advice or assistance to a consumer with regard to either subparagraph (i) or (ii) of this paragraph.

(2) "Credit services business" includes a person who sells or attempts to sell written materials containing information

that the person represents will enable a consumer to establish a new credit file or record.

(3) "Credit services business" does not include:

(i) Any person authorized to make loans or extensions of credit under the laws of this State or the United States who is actively engaged in the business of making loans or other extensions of credit to residents of this State;

(ii) Any bank, trust company, savings bank, or savings and loan association whose deposits or accounts are eligible for insurance by the Federal Deposit Insurance Corporation or any credit union organized and chartered under the laws of this State or the United States;

(iii) Any nonprofit organization exempt from taxation under § 501(c)(3) of the Internal Revenue Code (26 U.S.C. § 501(c)(3));

(iv) Any person licensed as a real estate broker by this State where the person is acting within the course and scope of that license;

(v) Any person licensed as a mortgage lender by this State;

(vi) An individual admitted to the Bar of the Court of Appeals of Maryland when the individual renders services within the course and scope of practice by the individual as a lawyer and does not engage in the credit services business on a regular and continuing basis;

(vii) Any broker-dealer registered with the Securities and Exchange Commission or the Commodity Futures Trading Commission where the broker-dealer is acting within the course and scope of that regulation;

(viii) Any consumer reporting agency as defined in the federal Fair Credit Reporting Act (15 U.S.C. §§ 1681–1681t) or in § 14–1201(e) of this title; or

(ix) An individual licensed by the Maryland Board of Public Accountancy when the individual renders services within the course and scope of practice by the individual as a certified public accountant and does not engage in the credit services business on a regular and continuing basis.

(f) *Extension of credit.*—"Extension of credit" means the right to defer payment of debt or to incur debt and defer its payment, offered or granted primarily for personal, family, or household purposes.

(g) *Person.*—"Person" includes an individual, corporation, government or governmental subdivision or agency, business trust, statutory trust, estate, trust, partnership, association, 2 or more persons having a joint or common interest, and any other legal or commercial entity.

(Emphasis added.)

A "credit services business" must, *inter alia,* secure a license from the Commissioner of Financial Regulation, CL § 14–1903(b),[14] provide the consumer with a written information statement, *id.* § 14–1904 to –1905, include certain provisions in the contract with the consumer, *id.* § 14–1906, and maintain a surety bond. *Id.* § 14–1908 to –1909. "A credit services business, its employees, and independent contractors [15] who sell or attempt to sell the services of a credit services business shall not[:]"

(1) Receive any money or other valuable consideration *from the consumer, unless* the credit services business has secured from the Commissioner a license under Title 11, Subtitle 3 of the Financial Institutions Article;

(2) Receive any money or other valuable consideration solely for referral of the consumer to a retail seller or to any

---

**14.** Section 14–1903(b) states, "A credit services business ... is subject to the licensing, investigatory, enforcement, and penalty provisions of this subtitle and Title 11, Subtitle 3 of the Financial Institutions Article" ("FI"). "Unless the person is licensed by the Commissioner, a person may not ... (3) Engage in the business of a credit services business as defined under Title 14, Subtitle 19 of the Commercial Law Article." FI § 11–302(b)(3).

**15.** The CSBA does not define "independent contractor." This Court has said that "[a]n independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right of control with respect to his physical conduct in the performance of the undertaking." *Washington News Co. v. Satti,* 169 Md. 489, 491, 182 A. 286, 287 (1936) (citations omitted).

other credit grantor who will or may extend credit to the consumer, if the credit extended to the consumer is substantially the same terms as those available to the general public;

(3) Make, or assist or advise any consumer to make, any statement or other representation that is false or misleading, or which by the exercise of reasonable care should be known to be false or misleading, to a consumer reporting agency, government agency, or person to whom the consumer applies or intends to apply for an extension of credit, regarding a consumer's creditworthiness, credit standing, credit capacity, or true identity;

(4) Make or use any false or misleading representations in the offer or sale of the services of a credit services business;

(5) Engage, directly or indirectly, in any act, practice, or course of business which operates as a fraud or deception on any person in connection with the offer or sale of the services of a credit services business;

(6) Charge or receive any money or other valuable consideration prior to full and complete performance of the services that the credit services business has agreed to perform for or on behalf of the consumer;

(7) Charge or receive any money or other valuable consideration in connection with an extension of credit that, when combined with any interest charged on the extension of credit, would exceed the interest rate permitted for the extension of credit under the applicable title of this article;

(8) Create, assist a consumer to create, or provide a consumer with information on how to create, a new consumer report, credit file, or credit record by obtaining and using a different name, address, telephone number, Social Security number, or employer tax identification number; or

(9) Assist a consumer to obtain an extension of credit at a rate of interest which, except for federal preemption of State law, would be prohibited under Title 12 of this article.

*Id.* § 14–1902 (emphasis added). "Any contract for services from a credit services business that does not comply with the applicable provisions" of the CSBA is "void and unenforceable as contrary to the public policy of this State[.]" *Id.* § 14–1907(b).

While neither expressly disputing nor conceding that its role in a RAL is covered by § 14–1901(e)(1)(i–iii), respondent argues that,[16] based on the plain language of the CSBA, it does not qualify as a "credit services business"[17] because it does not, under the language of § 14–1901(e)(1), offer its purported credit services "*in return* for the payment of money or other valuable consideration," *i.e.*, it is not paid *directly* by *the consumer.* (Emphasis added.) That it does not is recognized by the statement in Gomez's complaint that she "*indirectly*" paid respondent for arranging the RAL loan. (Emphasis added.)

Petitioners disagree that the CSBA requires direct payment, reminding us that "[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221, 1226 (2003) (citation omitted). They point out that § 14–1906 states in pertinent part:

(a) Requirements.—Every contract between a consumer and a credit services business for the purchase of the services of the credit services business shall be in writing, dated, signed by the consumer, and shall include:

✻　　✻　　✻

---

**16.** "In any proceeding involving this subtitle, the burden of proving an exemption or an exception from a definition is upon the person claiming it." CL § 14–1907(d).

**17.** "A person not included within the definition of a credit services business . . . is exempt from licensure requirements under this subtitle." CL § 14–1903(d).

(2) The terms and conditions of payment, including the total of all payments to be made by the consumer, whether to the credit services business *or to some other person[.]* (Emphasis added.) Petitioners assert that § 14–1906(a)(2) "expressly recognizes that payment may flow from the consumer directly to a third party, as in this case to a bank that has a contractual arrangement with" respondent, and supports "the conclusion that the direct payment from the consumer to the business is not a prerequisite to finding that the business is a credit services business. . . ." According to petitioners, "the Court of Special Appeals incorrectly read into the statute" this very prerequisite.

In support of its position, respondent refers us to *Midstate Siding & Window Co. v. Rogers*, 204 Ill.2d 314, 273 Ill.Dec. 816, 789 N.E.2d 1248 (2003), while petitioners refer us to *Harper v. Jackson Hewitt, Inc.*, 227 W.Va. 142, 706 S.E.2d 63 (2010) and *Fugate v. Jackson Hewitt, Inc.*, 347 S.W.3d 81 (Mo.App.2011).[18] These cases involve similar credit services statutes from other states and reach different conclusions.

In *Midstate*, Midstate, a home remodeling business, contracted with Mr. and Mrs. Rogers to provide work on their home. Unwilling to proceed with the work "without assis-

---

**18.** Petitioners also cite *Parker v. 1–800 Bar None, A Financial Corp.*, 2002 U.S. Dist. LEXIS 2139, 2002 WL 215530 (N.D.Ill. Feb. 11, 2002) to support their position. Petitioners "recognize that citation to an older 'unreported' decision may be disfavored," but, citing Fed. R.App. P. 32.1(a) (a court may not prohibit or restrict the citation of—for its persuasive value or for any other reason—an unpublished federal judicial opinion that is issued on or after January 1, 2007) and 4th Cir. Rule 32.1 (citation of Fourth Circuit's "unpublished dispositions issued prior to January 1, 2007, in briefs and oral arguments in" courts within the Fourth Circuit is generally "disfavored," unless a party believes that such a disposition "has precedential value in relation to a material issue in a case and there is no published opinion that would serve as well"), they aver that *Parker* has "precedential value for a material issue in this case." Aware that the Federal Rules of Appellate Procedure and the local rules of the United States Court of Appeals for the Fourth Circuit do not constrain Maryland's state courts, this Court has said that "the citation of unreported opinions (Maryland or otherwise) ordinarily is not appropriate." *Clancy v. King*, 405 Md. 541, 559 n. 17, 954 A.2d 1092, 1102 n. 17 (2008).

tance in obtaining an extension of credit," *id.* at 322, 273 Ill.Dec. at 822, 789 N.E.2d at 1254, Mr. and Mrs. Rogers filled out a credit application, which Midstate forwarded to Bank One, Illinois, N.A., which agreed to provide Mr. and Mrs. Rogers a home equity loan.[19] It was Midstate's position that it forwarded the credit application gratuitously.

Later, Midstate sued Mr. and Mrs. Rogers for breach of contract when they refused to allow Midstate to perform work on the home. In their answer, Mr. and Mrs. Rogers stated that the contract violated the Illinois Credit Services Act, 815 Ill. Comp. Stat. Ann. 605/1 *et seq.*, and filed a counterclaim alleging that Midstate had indicated that it "would obtain financing for the Rogers and/or provide advice or assistance to

---

**19.** The *Midstate* dissent explained:

[T]he Rogers ultimately agreed to the contract *only* because Midstate offered its services to help them obtain third-party financing. The parties' agreement indicated no cash payments and stated that the contract amount of $19,600 was subject to a loan. It disclosed no information about the applicable interest rates or monthly payment amount. Midstate concedes that it assisted the Rogers in securing a third-party loan. One of its sales representatives provided the Rogers with a credit application and directed them to complete it. The representative informed the couple that Midstate would obtain financing for them and that they would make monthly payments for approximately 15 years. Again, the representative failed to provide any information concerning the actual amount of the monthly payments.

After the representative's visit, a Midstate loan assistance employee reviewed the Rogers' credit application. The employee testified that Midstate assists customers with financing and that her job is to help qualify customers for loans. In this capacity, she reviews more than 50 credit applications each week. In this case, she received the Rogers' credit application, reviewed it, and then contacted a number of lending institutions on their behalf, forwarding their credit application in an effort to secure a loan. The first three institutions she contacted refused to extend credit to the Rogers. Eventually, Midstate secured a loan commitment from Bank One at a rate of 11.35%, adjustable monthly, but the Rogers found this interest rate unacceptable. The record contains no evidence that the Rogers *ever* independently met, or otherwise undertook loan negotiations, with *any* lending institution. Thus, Midstate acted as a *de facto* representative for the Rogers in obtaining the loan commitment, for the mutual benefit of both parties.

*Midstate*, 204 Ill.2d at 325–26, 273 Ill.Dec. at 824, 789 N.E.2d at 1255–56 (Kilbride, J., dissenting).

the Rogers in obtaining an extension of credit." *Midstate,* 204 Ill.2d at 317, 273 Ill.Dec. at 818, 789 N.E.2d at 1250. According to the counterclaim, "Midstate failed to describe the services [it] was to provide in obtaining the extension of credit," in violation of the Illinois Credit Services Act. *Id.*

The Supreme Court of Illinois held that the Illinois Credit Services Act [20] is aimed at credit repair, and "is not intended to regulate retailers primarily engaged in the business of selling goods and services to their customers." *Id.* at 324, 273 Ill.Dec. at 823, 789 N.E.2d at 1255. "Looking to the definition of a 'Buyer' and the definition of a '[c]redit [s]ervices [o]rganization,'" *id.* at 321, 273 Ill.Dec. at 821, 789 N.E.2d at 1253, the court reasoned that

> [t]he Credit Services Act requires that the credit services organization, *in return* for the payment of money or other valuable consideration, agree to provide, or represent that it will provide, credit services to the buyer.... Thus, the Credit Services Act requires payment *for credit services,* not simply payment for other goods or services.

*Id.* at 322, 273 Ill.Dec. at 821, 789 N.E.2d at 1253–54 (emphasis added). Because "[t]he contract at issue does not provide for payment of money or other valuable consideration in return for credit services provided by Midstate," the statute did not apply. *Id.*[21]

---

**20.** The Illinois Credit Services Act states in pertinent part:
(a) "Buyer" means an individual who is solicited to purchase or who purchases the services of a credit services organization.

\* \* \*

(d) "Credit Services Organization" means a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:
(i) improving a buyer's credit record, history, or rating;
(ii) obtaining an extension of credit for a buyer; or
(iii) providing advice or assistance to a buyer with regard to either subsection (i) or (ii).
815 Ill. Comp. Stat. Ann. 605/3.

**21.** Petitioners distinguish *Midstate,* stating that in *Midstate,* unlike in this case, there was no "business relationship" between the RAL facilitator and the lender.

In *Harper v. Jackson Hewitt, Inc.,* Hunter, like Gomez in the instant case, "hired Jackson Hewitt to prepare her federal income tax return ... and in the process, purchased a [RAL].... Hunter claimed that she allowed Jackson Hewitt to forward her application for the RAL, along with her tax return, to [SBBT]...." 227 W.Va. 142, 145, 706 S.E.2d 63, 66 (2010). She filed a class action suit in the United States District Court for the Southern District of West Virginia, alleging, *inter alia,* that Jackson Hewitt had violated West Virginia's credit services statute.[22] The federal court certified four questions to the West Virginia Supreme Court of Appeals, including: "Does a tax preparer who receives compensation, either directly from the borrower or in the form of payments from the lending bank, for helping a borrower obtain a refund anticipation loan meet the statutory definition of a credit services organization" under West Virginia's credit services statute? *Id.* at 147, 706 S.E.2d at 68.[23]

Noting that the statute did not expressly require that a consumer must pay the credit services organization "directly," *id.* at 150, 706 S.E.2d at 71, the court concluded that

[w]hether the Legislature intended to require direct payment or not, the plain and broad sweeping language contained in the statute leads us to no other possible conclusion. Accordingly, we find that a tax preparer who receives compensation, *either directly from the borrower or in the form of payments from the lending bank,* for helping a borrower obtain a RAL meets the statutory definition of a

---

**22.** Plaintiffs later were granted leave to amend the complaint to substitute Christian and Elizabeth Harper and Donna Wright for Hunter.

**23.** Under West Virginia's credit services statute,

(a) A credit services organization is a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:

(1) Improving a buyer's credit record, history or rating;

(2) Obtaining an extension of credit for a buyer; or

(3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2) of this subsection.

W. Va.Code § 46A–6C–2.

credit services organization under W. Va.Code § 46A–6C–2(a).

*Id.* (emphasis added). Nevertheless, the court "encourage[d] the Legislature to amend the provisions of W. Va.Code § 46A–6C–1, *et seq.,* to provide a clarification of the" credit services statute. *Id.* at 151 n. 12, 706 S.E.2d at 72 n. 12.

Petitioners contend that West Virginia's credit services statute "contains a definition of [']credit services organization['] that is essentially identical to [']credit services business['] under Maryland's CSBA," and therefore *Harper* should be considered persuasive authority. Respondent argues, in turn, that *Harper* was wrongly decided without the benefit of the statute's legislative history. Respondent also finds support in the Court of Special Appeals's comment on the *Harper* court's encouragement of legislative clarification:

> [H]aving rendered a cursory disposition of the issue, obviously concerned that the statute needed clarification—notwithstanding its unequivocal decision, [the court] "encouraged" the West Virginia legislature to provide a clarification of the CSOA to explicate the application, *vel non,* of the CSOA to entities like Jackson Hewitt.

*Gomez v. Jackson Hewitt, Inc.,* 198 Md.App. 87, 122 n. 8, 16 A.3d 261, 282 n. 8 (2011). According to respondent, this statement recognizes the "contradiction" between the *Harper* court's holding and its encouragement of legislative clarification, and that "[s]urely, if the West Virginia credit services organization act were unambiguous, there would be no need for the Legislature to clarify it to avoid the absurd results that the West Virginia Supreme Court undoubtedly recognizes."

In *Fugate v. Jackson Hewitt, Inc.,* Jackson Hewitt prepared Fugate's federal income tax return, and, according to the complaint, "obtained an extension of credit for her in the form of a" RAL from SBBT. 347 S.W.3d 81, 83 (Mo.App.2011). As described by the Court of Appeals of Missouri,

> Fugate filed her petition for a class action against Jackson Hewitt two years after the RAL transaction. In Count I of her petition, Fugate contended that, because Jackson Hew-

itt obtained an extension of credit for her, Jackson Hewitt was a credit services organization pursuant to [Missouri's credit services organizations statute].[24] Fugate alleged that, as a credit services organization, Jackson Hewitt was required to comply with certain statutory requirements but failed to do so.

*Id.* at 83–84.

The court, reversing a lower court's dismissal of the complaint, explained:

The plain and ordinary meaning of "purchase" is "to obtain (as merchandise) by paying money or its equivalent: buy for a price." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 1844 (1993). This dictionary definition of "purchase" requires that the recipient of goods, or in this case, services, pay money or other consideration for obtaining such services. It also requires that the provider of services receive payment for such services. It does not, however, require a *direct payment* from the recipient to the provider for the services. Nothing in section 407.635(1)'s definition of a "buyer" requires that the payment from the buyer to the credit services organization be a direct payment.

Similarly, nothing in section 407.637.1's definition of a "credit services organization" as a person who provides services "in return for the payment of money or other valuable consideration" requires that it be a direct payment.

---

**24.** Missouri's credit services organizations statute states, in pertinent part:

1. A credit services organization is a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides or represents that the person can or will provide any of the following services:

(1) Improving the buyer's credit record, history or rating;

(2) Obtaining an extension of credit for a buyer; or

(3) Providing advice or assistance to a buyer with regard to subdivision (1) or (2) of this subsection.

Mo. Ann. Stat. § 407.637. The statute also defines a "buyer" as "an individual who is solicited to purchase or who purchases the services of a credit services organization." *Id.* § 407.635(1).

Jackson Hewitt notes that the dictionary definition of the phrase "in return" is "to give or perform in return: repay" and "to respond in kind." Although Jackson Hewitt argues that this language contemplates only a direct exchange of payment for services between the buyer and the credit services organization, we do not read it so narrowly. As long as the credit services organization provides services to the buyer, the buyer pays for those services, and the credit services organization receives payment for the services, section 407.637.1 is satisfied. There is nothing explicit or implicit in the plain and ordinary meaning of the phrase "in return" that requires a direct payment from the buyer to the credit services organization.

*Id.* at 86 (emphasis added).

 We shall assume that respondent "provid[es] advice or assistance to a consumer with regard to . . . [o]btaining an extension of credit for a consumer." CL § 14–1901(e)(1)(ii)–(iii). That said, to be subject to the CSBA, that "advice or assistance" must be provided *"in return* for the payment of money or other valuable consideration[.]" *Id.* § 14–1901(e) (emphasis added). *Merriam–Webster's Collegiate Dictionary* 998–99 (10th ed. 2000) defines "return" in part as **"in return:** in compensation or repayment" and "to give or perform in return: REPAY." In the context of the CSBA and § 14–1901(e), "in return" can reasonably be understood to envision an exchange of assistance for payment between the consumer and the provider of that assistance and to mean that any payment to the credit services business for such assistance in obtaining the extension of credit must come *directly* from *the consumer.* This understanding of § 14–1901 is consistent with § 14–1902(1), which prohibits a credit services business from "[r]eceiv[ing] any money or other valuable consideration *from the consumer, unless* the credit services business has secured from the Commissioner a license under Title 11, Subtitle 3 of the Financial Institutions Article[.]" (Emphasis added.) This provision suggests that it is the receipt of payment *from the consumer* that is necessary for an entity to

qualify as a credit services business.[25] Here, Gomez made no payment to respondent for credit services; whatever respondent received for its involvement in her RAL came from SBBT. If respondent is not a "credit services business," then Gomez is not a "consumer" under the CSBA. *See* CL § 14–1901(c) (" 'Consumer' means any individual who is solicited to purchase or who purchases for personal, family, or household purposes the services of a *credit services business.*") (emphasis added).

Petitioners argue that, "[h]ad the General Assembly intended to exclude RAL facilitators from coverage under the CSBA, it easily could have done so by including such entities in the nine enumerated exceptions," set forth in § 14–1901(e)(3), to the definition of "credit services business." "That the legislature did not indicates its intent that the credit services organization statutes apply to such entities." *Id.* at 88. Petitioners observe that tax preparers are not included among the enumerated exemptions, and that some credit services statutes in other states expressly exempt RAL facilitators under certain circumstances. *See, e.g.,* 24 Okla. Stat. Ann. § 132 (exempting "any person authorized to file electronic income tax returns who does not receive any consideration for refund anticipation loans"). They conclude, referring to this Court's comment in *Ferrero Constr. Co. v. Dennis Rourke Corp.,* 311 Md. 560, 575, 536 A.2d 1137, 1144 (1988), that "[w]hen the legislature has expressly enumerated certain exceptions to a principle, courts normally should be reluctant thereafter to create additional exceptions." They contend that "[s]uch reasoning is in keep-

---

**25.** Section 14–1906(a)'s requirement that a "contract between a consumer and a credit services business for the purchase of the services of the credit services business" shall include "[t]he terms and conditions of payment, ... whether to the credit services business *or to some other person,*" does not support petitioners' view that "direct payment from the consumer to the business is *not* a prerequisite to finding that the business is a credit services business." (Emphasis added.) Rather, § 14–906(a)(2) presupposes the existence of a credit services business that is disclosing terms and conditions of payment by the consumer that could include some required payment to another person. Nor does it suggest that the "other person" is a credit services business.

ing with another maxim of statutory construction: *expressio unius est exclusio alterius* (the expression of one thing is the exclusion of another)." *Leppo v. State Highway Admin.*, 330 Md. 416, 423, 624 A.2d 539, 543 (1993).

■ We are not persuaded that this interpretation of the CSBA creates an "additional exception[ ]" from coverage under the statute for RAL facilitators who are not paid directly by the consumer. Presumably, were they not exempted, any of the entities listed under § 14-1901(e)(3) could be covered by the CSBA if they met the definition of "credit services business" provided by § 14-1901(e)(1)(i)-(iii). Rather than specifically "exempting" RAL facilitators from the CSBA, this interpretation would simply mean that tax preparers who do not receive payment directly from the consumer are not a "credit services business." Nor are we persuaded that the enumerated exceptions necessitate an inclusion of anything not contained on that list. "[N]ot all statutory enumerations are limited by" the canon of *expressio unius est exclusio alterius*. *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712, 37 A.3d 972, 978 (2012). "[T]his particular canon of construction should be applied with extreme caution, as '[it] is not a rule of law, but merely an auxiliary rule of statutory construction applied to assist in determining the intention of the Legislature where such intention is not manifest from the language used.'" *Breslin v. Powell*, 421 Md. 266, 26 A.3d 878, 895 (2011) (quoting *Walzer v. Osborne*, 395 Md. 563, 579, 911 A.2d 427, 436 (2006)).

■ When engaged in statutory construction and the pursuit of legislative intent, we consider the provision under review "in light of the statutory scheme." *Mayor & City Council of Balt. v. Chase*, 360 Md. 121, 129, 756 A.2d 987, 995 (2000), in an effort to avoid an illogical result. It appears to us that many provisions of the CSBA do not logically apply to RAL facilitators.[26]

---

**26.** Of course, the inapplicability of certain provisions would not necessarily negate the applicability of the entire statute to RAL facilitators.

For example, § 14–1902(3) states that a credit services business shall not

[m]ake, or assist or advise any consumer to make, any statement or other representation that is false or misleading, or which by the exercise of reasonable care should be known to be false or misleading, to a consumer reporting agency, government agency, or person to whom the consumer applies or intends to apply for an extension of credit, regarding a consumer's creditworthiness, credit standing, credit capacity, or true identity[.]

It is unclear how this subsection would readily apply to a RAL facilitator. At the heart of a RAL is a tax refund that is intended to secure the loan. It is illogical to think that the General Assembly was concerned that a tax preparer would falsely generate or represent a tax refund. Similarly, § 14–1904 requires a credit services business to provide the consumer with a written information statement, which, under § 14–1905(a), must contain:

(1) An accurate statement of the consumer's right to review any file on the consumer maintained by any consumer reporting agency, and the right of the consumer to receive a copy of a consumer report containing all information in that file as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681g) and under § 14–1206 of this title;

(2) A statement that a copy of the consumer report containing all information in the consumer's file will be furnished free of charge by the consumer reporting agency if requested by the consumer within 30 days of receiving a notice of a denial of credit as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681j) and under § 14–1209 of this title;

(3) A statement that a nominal charge not to exceed $5 may be imposed on the consumer by the consumer reporting agency for a copy of the consumer report containing all the information in the consumer's file, if the consumer has not been denied credit within 30 days from receipt of the consumer's request;

(4) A complete and accurate statement of the consumer's right to dispute the completeness or accuracy of any item on the consumer contained in any file that is maintained by any consumer reporting agency, as provided under the federal Fair Credit Reporting Act (15 U.S.C. § 1681i) and under § 14–1208 of this title;

(5) A complete and detailed description of the services to be performed by the credit services business for or on behalf of the consumer, and the total amount the consumer will have to pay for the services; and

(6) A statement that accurately reported information may not be permanently removed from the file of a consumer reporting agency.

With the exception of section (5), such provisions are more clearly applicable to consumers seeking to improve or repair their credit score. As respondent points out, "[t]here is nothing in these provisions that ... contemplates RAL transactions."

Section 14–1906 states:

(a) *Requirements.*—Every contract between a consumer and a credit services business for the purchase of the services of the credit services business shall be in writing, dated, signed by the consumer, and shall include:

\* \* \*

(3) A complete and detailed description of the services to be performed and the results to be achieved by the credit services business for or on behalf of the consumer, including all guarantees and all promises of full or partial refunds and a list of the adverse information appearing on the consumer's credit report that the credit services business expects to have modified and the estimated date by which each modification will occur[.]

Certainly, respondent has no control over the consumer's credit report and has not been engaged to modify that report.

Finally, when "seeking to ascertain legislative intent, [a court] may consider the consequences resulting from one

meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 75, 517 A.2d 730, 732 (1986); *see also Briggs v. State*, 413 Md. 265, 275, 992 A.2d 433, 439 (2010). Again, as pointed out by respondent, under petitioners' interpretation of the CSBA, many "mainstream businesses across Maryland" which "routinely offer assistance to customers with applications for credit offered by third-party banks in exchange for compensation from the banks" may fall under the purview of the CSBA, including "department stores, electronic retailers, big box retailers, bookstores, gas stations[, and] clothing retailers."

In sum, we are persuaded that the most logical reading of the CSBA as a whole is that it was not intended to regulate RAL facilitators who do not receive compensation directly from the consumer. But, even if we assume that petitioners' interpretation is not unreasonable, a review of the legislative history, along with other extrinsic aids, confirms that view.[27]

As this Court recently said in *Brooks v. Hous. Auth.*, 411 Md. 603, 621, 984 A.2d 836, 847 (2009),

> [i]f the language [of a statute] can be subject to more than one interpretation, or if the terms are ambiguous when part of a larger statutory scheme, "we endeavor to resolve that ambiguity by looking to the statute's legislative history, case law, statutory purpose, as well as the structure of the statute." [*Anderson v. Council of Unit Owners of the Gables on Tuckerman Condo.*, 404 Md. 560, 572, 948 A.2d 11, 19 (2008) ]. The language should not be interpreted in isolation when the statute is part of a larger statutory scheme. *Id.* We analyze the statute as a whole considering the " 'purpose, aim, or policy of the enacting body.' " *Id.*

---

**27.** In doing so, we note that neither party argues that the language of the CSBA is ambiguous. Both claim that it is their interpretation of the "unambiguous" plain language that should prevail. We also note that courts have reached different decisions as to whether the plain language of this statute and other similar statutes is ambiguous.

(quoting *Serio v. Baltimore County,* 384 Md. 373, 389, 863 A.2d 952, 961 (2004)).

Moreover, even when we believe that the language of the statute renders legislative intent clear, it is appropriate to examine the legislative history as a confirmatory process. *See Mayor & City Council of Baltimore v. Chase,* 360 Md. 121, 131, 756 A.2d 987, 993 (2000).

To support its view that the CSBA does not apply to RAL facilitators, respondent contends that the legislative history surrounding the 1987 legislation enacting the CSBA, H.B. 472, demonstrates that the CSBA intended to regulate "credit repair agencies," not RAL facilitators. H.B. 472's "Statement of Purpose" provides:

> FOR the purpose of providing certain protections to the consumers of credit services business; requiring credit services businesses to provide certain information to customers; establishing certain requirements for contracts between credit services businesses and consumers; requiring a surety bond or trust account in certain circumstances; defining certain terms; providing certain civil and criminal penalties; providing administrative remedies; providing certain limitation periods; making provisions of this Act severable; and generally relating to the regulation of credit services businesses.

1987 Md. Laws, ch. 469. The "Background" section of the House of Delegates Floor Report on H.B. 472 states,

> Proponents claim that some credit services businesses, or *"credit repair agencies"* have engaged in unfair and deceptive practices. They claim that the agencies frequently cannot deliver the services offered or the services offered are such that they can be performed by the customer with little effort. According to the [C]ommissioner ... *there are at least six credit repair agencies operating in this state.* The agencies are subject to the [CPA], but are not otherwise regulated.

(Emphasis added.)

The bill file also includes several letters from supporters of H.B. 472—including the Office of Consumer Affairs of Mont-

gomery County, the Consumer Credit Association of Greater Washington, and the consumer reporting agency TRW, Inc.— stating that the bill targeted "credit repair agencies." And there are, as described by the Court of Special Appeals, "multiple newspaper articles in the bill file decrying the practices of credit repair agencies that improperly lead consumers to believe that they can offer a 'quick fix' to credit problems and rehabilitate poor credit records." *Gomez v. Jackson Hewitt, Inc.*, 198 Md.App. 87, 112 n. 4, 16 A.3d 261, 276 n. 4 (2011).

Petitioners argue, focusing on the disjunctive "or" in the "Summary" section of the House of Delegates Floor Report on H.B. 472,[28] nestled between "obtaining an extension of credit" and "providing advice about either," that it indicates the General Assembly's intent to target more than "credit services businesses which accept fees for attempting to improve a consumer's credit record," *i.e.*, "credit repair services." [29]

 We, however, agree with the Court of Special Appeals that the "documents in the bill file make clear that the General Assembly enacted the CSBA in response to concerns about predatory practices and misleading advertising of '*credit repair organizations*,'" *id.* at 112, 16 A.3d at 276 (emphasis added), and that "the General Assembly understood its original 1987 enactment of the CSBA to be for the purpose of regulating *credit repair agencies* who take fees from consumers to improve or extend credit, or to give advice or assistance

---

**28.** The "Summary" section states that "[t]his bill create[d] a new subtitle to regulate credit services businesses which accept fees for attempting to improve a consumer's credit record, history or rating, obtaining an extension of credit, *or* providing advice about either." (Emphasis added.)

**29.** At the motions hearing before the Circuit Court, Gomez's counsel stated, in regard to H.B. 472, "I think you can't look at the legislative history which is admittedly sparse and would I say certainly inconclusive." In their reply brief, petitioners describe the CSBA's legislative history as "a mixed bag."

in such matters." *Id.* at 113, 16 A.3d at 277 (emphasis added).[30] For example,

> [the "Background" section of the Floor Report] confirms that, in enacting the CSBA, the General Assembly intended to target "credit repair agencies." In other words, the legislature sought to regulate those in the business of claiming to offer services to improve a consumer's credit or otherwise extending credit in exchange for a fee paid by consumers. As we see it, this language denotes an intent, on the part of the legislature, to regulate companies in the business of improving or extending credit, particularly those that over promise and mislead consumers and not companies, such as [respondent], who are in the business of tax preparation and offer to send business to a third party for a loan, without receiving a fee from the consumer.

*Id.* at 112, 16 A.3d at 276.

Looking beyond the legislative history of H.B. 472, petitioners claim that the 2001, 2002, and 2010 amendments to the CSBA, which focus on payday lenders, demonstrate that the CSBA is not limited to credit repair agencies. In 2001, the General Assembly enacted S.B. 882 (cross-filed as H.B. 973) to amend the CSBA. S.B. 882 took the list of activities from which, under § 14–1902, "a credit services business, its employees, and independent contractors who sell or attempt to sell the services of a credit services business" are prohibited, recodified it under newly-created subsection (a), and added newly-created Section (8) to that list. Section (8) stated that a credit services business shall not, "[s]ubject to the provisions of subsection (b) of this section"—which was also created by S.B. 882—"assist a consumer to obtain an extension of unsecured closed end credit at a rate of interest which, except for federal preemption of State law, would be prohibited under

---

**30.** The House Economic Matters Committee's Bill Analysis for H.B. 1242, which in 1990 amended the CSBA to increase penalties for violations, states that the CSBA "was enacted in 1987 and regulates persons who provide *credit repair services.*" (Emphasis added.)

Title 12, Subtitle 1, 3 or 10 of this Article." 2001 Md. Laws, ch. 630. Subsection (b) stated, in part:

(b)(1)(i) In this subsection, "Payment Instrument" means a check or a draft ordering a person to pay money.

(ii) "Payment Instrument" includes a money order.

(2) Under subsection (a)(8) of this section, an extension of unsecured closed end credit includes an extension of credit for which a payment instrument is held to ensure payment.

Subsection (b) also created the Short–Term Small Consumer Loan Study Commission for the purpose of determining "the need for short-term, small consumer loans," to "identify the reasons why traditional lenders may not be fully meeting the need for short-term, small consumer loans in the State," to "evaluate alternatives to help meet the need for short-term small consumer loans," and to report to the General Assembly and make a recommendation and proposal for legislation if necessary. *Id.*

The "Background" section of an analysis produced by the Senate Finance Committee on S.B. 882 explains:

Under Maryland law, the permissible annual interest rate is 33% for small loans (under $6,000). However, under federal law, a federally insured depository institution, whether federal or state-chartered, may charge the interest rate permitted in its home state to borrowers across state lines, regardless of the legal rate in the borrower's state. Thus, for example, a bank in South Dakota, which has no interest limit, may charge a Maryland borrower an interest rate exceeding the State's 33% limit. *A credit services business, operating in Maryland, may broker the transaction between the borrower and the lender.*

Testimony on Deferred Presentment Services (SB 601 of 2001) indicated that *payday lenders are partnering with a federal bank in order to "import" rates into Maryland.*

(Emphasis added.)

Included in the bill file is a letter, in support of S.B. 882, from the Director of Public Policy for the Maryland Center for Community Development to the Senate Finance Committee,

which states that "out of state banks are exporting *payday loans* to Maryland through third parties—brokers. This bill will assure that the state has the ability to enforce the small loan laws by *prohibiting a broker from arranging a loan* that is otherwise illegal by state law." (Emphasis added.) Also in the bill file is a letter to Senator Delores Kelley and Delegate Maggie McIntosh from Assistant Attorney General Robert Zarnoch (now an associate judge on the Court of Special Appeals of Maryland), in his capacity as Counsel to the General Assembly, opining that S.B. 882 "is not preempted by or in conflict with federal laws regulating national banks and federal savings and loan associations." The letter explains that S.B. 882

> is *primarily aimed at "payday loans"* and particularly, third party arrangements that some federally-insured depository institutions, such as national banks and federal savings and loan associations, have entered into with local agents (usually a check cashing business) to broker such loans. Because these federally-insured depository institutions may charge[, under § 85 of the National Bank Act, 12 U.S.C. § 1 *et seq.,*] the interest rate permitted in their home states to Maryland borrowers, a payday borrower may be charged interest in excess of State usury laws. Senate Bill 882/House Bill 973 would not prevent federally-insured depository institutions from directly making payday loans at "exported" rates of interest. *The legislation is aimed only at local agents and the role they play in facilitating payday loans and interest rates in excess of those permitted by Maryland law . . . .*

(Emphasis added.)

Finally, the bill file contains the Commissioner's written testimony regarding S.B. 882,

> which would prohibit the facilitation of *payday loans* in Maryland *by third-party agents of lenders.*
>
> During the 2000 Legislative Session the practice of out-of-state, federally insured depository institutions "exporting" high interest payday loans from the states where they are

located into Maryland was raised. This practice is permitted by federal law. Nevertheless, by rejecting legislation that would have permitted these high cost loans to be made by Maryland domiciled lenders, the General Assembly made a strong public policy statement against such loans.

The federal preemption of State law *as to the interest rates* charged by the lenders together with alliances with third-party agents has provided some *check cashing agencies* with a means to avoid the Maryland usury law ceiling and to participate in making payday loans at unconscionable interest rates, far in excess of those permitted by Maryland law. While SB 882 does not and cannot interfere with the federally insured lender's ability to *directly* make those loans in Maryland, it does not prohibit local agents from facilitating the transactions.[31]

*Under the [CSBA], if a lender compensates a third-party to assist Maryland consumers obtain credit, the agents are subject to the Act. The Act does not prevent the exportation of interest rates or the making of high-cost payday loans, but it does subject the third party agents to the licensing, disclosure and other provisions of the Act.*

**Upon advice of counsel, this has been the Commissioner's consistent interpretation and position as to application of the Act to these third-party agents.**

(Italicized emphasis added.)

In 2002, the General Assembly passed H.B. 1193 to again amend the CSBA. It modified the 2001 amendment's changes so as to read:

A credit services business, its employees, and independent contractors who sell or attempt to sell the services of a credit services business shall not:

\* \* \*

---

31. The interpretation of the Commissioner "upon the advice of counsel" does not necessarily reflect legislative intent in regard to the RALs and direct or indirect payment to facilitators of RALs.

(8) Subject to the provisions of subsection (b) of this section, assist a consumer to obtain an extension of unsecured closed end credit *or closed end credit secured by personal property* at a rate of interest which, except for federal preemption of State law, would be prohibited under Title 12, Subtitle 1, 3, or 10 of this article.

2002 Md. Laws, ch. 561 (emphasis added).[32] According to the Senate Finance Committee Summary, H.B. 1193 "expands the prohibition that was enacted last year which applies to extensions of *unsecured* closed end credit. Accordingly, this bill applies to *any* extension of credit." Similarly, the Fiscal Note states that

[t]his bill prohibits a credit services business, its employees, and its independent contractors from assisting a consumer to obtain an extension of credit at an interest rate which, except for federal preemption, would be prohibited under the State's consumer credit provisions.

In written testimony, the Commissioner stated,

[H.B. 1193] would attempt to *prohibit payday loans* being offered in Maryland by third party agents of lenders. Last year the General Assembly passed SB 882 which attempted to achieve this result. Amendments to that bill resulted in its failure in fact to *prevent payday lending as intended.* During the interim, a payday lender who is the agent of a third party lender has begun doing substantial business in Maryland. This bill would prohibit the activities now being conducted by that agent and should achieve the results the legislature intended last year.

(Emphasis added.)

Finally, in 2010 the General Assembly enacted H.B. 79 (cross-filed as S.B. 678), which added section (7) to § 14–1902,[33] which states that a credit services business shall not

---

32. H.B. 1193 also deleted the language in subsection (b) about the Short–Term Small Consumer Loan Study Commission. *See* 2002 Md. Laws, ch. 561.

33. H.B. 79, to accommodate the addition of the new section (7), recodified the former sections (7) and (8) as (8) and (9), respectively.

[c]harge or receive any money or other valuable consideration in connection with an extension of credit that, when combined with any interest charged on the extension of credit, would exceed the interest rate permitted for the extension of credit under the applicable title of this article[.]

2010 Md. Laws, ch. 385. According to the sponsor of S.B. 678, the bill

merely clarifies that all fees associated with *a payday loan* fall under the usury cap here in the State of Maryland, which is for a loan above $6,000 is [sic] 33%, below $6,000 is 24%. The necessity for the bill is this new business model out there allowing an out-of-state business to surpass the usury caps here in the State which have been in place for at least the past 25 years. . . . [W]hat we are trying to deal with is the *gouging of the public by essentially one company*. One company that charges up to 600 percent for a payday loan if you calculate in the fees that they charge. . . . They are based in Texas. This is all done over the internet. Other states have prohibition [sic] exactly like this and what we are trying to do is close that loophole.

The Maryland Consumer Rights Coalition (MCRC) submitted written testimony to the Senate Finance Committee stating that

SB 678 is needed to close a loophole in [the CSBA] and supports *the legislature's intent to prohibit payday lending* in Maryland. Payday loans are not legal in Maryland and never have been. . . . Ten years ago, check cashers tried to get Maryland law amended to authorize payday loans at 391 percent APR for a two-week loan. Ten years ago, the Maryland legislature rejected that initiative and refused to make payday lending legal.

Then, payday lenders partnered with banks in a "rent-a-bank scheme." Working with out-of-state banks, the payday lenders claimed to be brokering loans for their partner

The bill also deleted subsection (b) in its entirety. *See* 2010 Md. Laws, ch. 385.

banks. To redress the issue, the Maryland legislature amended the [CSBA] to prevent this practice. Undeterred, payday lenders then tried to disguise payday loans as secured transactions or as payments for other services. Ace Cash Express changed its loan design to claim such transactions were "secured." In 2002, the [CSBA] was amended to include secured transactions.

Recently, online lenders have tried again to subvert the Maryland legislature's decision to cap loans at 33 percent. Online payday lenders are partnering with predatory service organizations to charge interest plus service fees, making the APR up to 600 percent, far exceeding the Maryland's [sic] rate cap....

SB 678 clarifies that all fees be included within the 33 percent cap. Closing this loophole protects Maryland consumers from predatory payday lenders and is consistent with past actions the Maryland legislature has undertaken to maintain a 33 percent rate cap in the state.

Payday lending companies are not located in Maryland. Consumers are accessing payday loans online....

MCRC urges the Committee to support SB 678 to ensure that loans are brokered in such a way that the 33 percent cap is inclusive of all transaction costs.

(Emphasis added.)

According to petitioners, the legislative history of the 2001 amendment "demonstrates that the General Assembly ... was well aware that: (1) the CSBA applies to persons who assist consumers in obtaining credit from third-party lenders; and (2) the assistance need not be related to credit repair services." Moreover,

[t]he legislative history suggests that the General Assembly was concerned as much, if not more so, with the relationship between the loan arranger and the out-of-state-lender ... as it was with the exact nature of the loan product itself, particularly in light of the fact that the State could regulate the activities of loan arrangers while the out-of-state lenders

and their loan products were often beyond the General Assembly's reach due to federal preemption.[34]

Petitioners assert that the enactment of the 2002 amendment "further confirms that the General Assembly was fully aware that the CSBA applies to businesses that assist Maryland consumers in obtaining extensions of credit, *no matter what the purpose or intent of the loan or other extension of credit,*" and that the 2010 amendment "provides further support for concluding that the Act applies to *all* extensions of credit." (Emphasis added.)

▆▆▆ To be sure, the legislative history of the amendments indicates that the reach of the CSBA extends beyond ordinary credit repair services. On the other hand, the legislation was clearly industry specific and did not address expressly the issue of direct or indirect payment from the consumer to the RAL facilitator as presented in this case. We are not persuaded that such industry-specific legislation indicates the General Assembly's intent to regulate income tax preparers that assist their clients receiving, through a third-party lender, a RAL, if they do not receive any payment directly from the consumer for that assistance.

▆▆▆ "Extrinsic materials ... 'have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms.'" *Turner v. Kight,* 406 Md. 167, 175–176, 957 A.2d 984, 989 (2008) (quoting *Exxon Mobil Corp. v. Allapattah Services, Inc.,* 545 U.S. 546, 568, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005)). Looking beyond the legislative history, petitioners also refer us to two Advisory Notices promulgated by the Commissioner in 2005 and 2008, respectively, an Opinion of the Maryland Attorney General, and the 2010 RAL legislation.

---

**34.** Petitioners also argue that the plain language of the statutory provision created by the 2001 amendment "has nothing to do with credit repair. Instead, it focuses on an entity that arranges loans on behalf of a lender, not unlike the relationship that [respondent] has with SBBT."

Petitioners aver that the Commissioner [35] and the Office of the Attorney General [36] "have consistently interpreted the [CSBA] to include entities that assist consumers in obtaining extensions of credit, *including RALs*," and that we should afford "appropriate deference" to these interpretations. (Emphasis added.)

---

**35.** This Court has said,

The consistent and long-standing construction given a statute by the agency charged with administering it is entitled to great deference, *Balto. Gas & Elec. v. Public Serv. Comm'n*, 305 Md. 145, 161–62, 501 A.2d 1307, 1315 (1986), as the agency is likely to have expertise and practical experience with the statute's subject matter. *See, e.g., Sinai Hosp. v. Dept. of Employment*, 309 Md. 28, 46, 522 A.2d 382, 391 (1987); 2B N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 49.05, at 17 (5th ed.1993). The weight given an agency's construction of a statute depends on several factors—the duration and consistency of the administrative practice, the degree to which the agency's construction was made known to the public, and the degree to which the Legislature was aware of the administrative construction when it reenacted the relevant statutory language. *Magan v. Medical Mutual*, 331 Md. 535, 546, 629 A.2d 626, 632 (1993). Other important considerations include "the extent to which the agency engaged in a process of reasoned elaboration in formulating its interpretation" and "the nature of the process through which the agency arrived at its interpretation," with greater weight placed on those agency interpretations that are the product of adversarial proceedings or formal rules promulgation. *Balto. Gas & Elec.*, 305 Md. at 161–62, 501 A.2d at 1315. An administrative agency's construction of the statute is not entitled to deference, however, when it conflicts with the unambiguous statutory language. *Falik v. Prince George's Hosp.*, 322 Md. 409, 416, 588 A.2d 324, 327 (1991). *See generally* 2A SINGER, supra, § 45.12.

*Marriott Emples. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 445–46, 697 A.2d 455, 459 (1997).

**36.** With respect to opinions of the Attorney General construing statutes, this Court has said that

courts are not bound by an Attorney General's Opinion, but that "when the meaning of legislative language is not entirely clear, such legal interpretation should be given great consideration in determining the legislative intention." *State v. Crescent Cities Jaycees*, 330 Md. 460, 470, 624 A.2d 955, 960 (1993); *see also Read Drug & Chem. Co. v. Claypoole*, 165 Md. 250, 257, 166 A. 742, 745 (1933). The Legislature is presumed to be aware of the Attorney General's statutory interpretation and, in the absence of enacting any change to the statutory language, to acquiesce in the Attorney General's construction. *See Claypoole, supra,* 165 Md. at 257–58, 166 A. at 742.

*Chesek v. Jones*, 406 Md. 446, 463, 959 A.2d 795, 805 (2008).

The Commissioner's January 24, 2005 Advisory Notice warns tax preparers that

> if you are assisting Maryland consumers to obtain short term loans, whether secured by the consumers' anticipated tax refund or not and you receive compensation in return, you are in fact, operating as a credit services business as defined in Commercial Law Article, § 14–1901(b).... Anyone who offer [sic] these [RALs], through a third party, must be licensed as a credit services business by Commercial Law Article, § 14–1903(b).[37]

The Commissioner's May 15, 2008 Advisory Notice states in pertinent part that the Commissioner has "interpreted the [CSBA] to apply *to tax preparers who are compensated in any manner (either by the consumer or the lender)* to assist consumers in obtaining RALs from third-party lenders." (Emphasis added.) In support of their position that this Court should afford "appropriate deference" to the Commissioner's "consistent" interpretation of the CSBA, petitioners, acknowledging that "the General Assembly may not have been aware of the Commissioner's interpretation of the CSBA *with regard to RALs* specifically until the 2005 Advisory Notice." They assert, however, that, in light of the alleged structural similarities between a payday scheme and a RAL scheme,[38] "the legislature has been aware, at least since the" Commissioner's public testimony in the 2001 session, *supra,* "that the Commissioner interprets the CSBA to require the licensing of entities that assist consumers in obtaining short-term extensions of credit." (Emphasis added.)

---

**37.** "Between 2005 and 2007, the Commissioner repeatedly threatened to enforce the CSBA against ... tax preparers, asserting that businesses 'arranging RALs who receive a fee either from the lender or the consumer must [comply with the CSBA].'" *H & R Block Eastern Enters. v. Raskin,* 591 F.3d 718, 720 (4th Cir.2010) (alteration in *Raskin*).

**38.** Before the Court of Special Appeals, Gomez argued that "the distinction between the two types of loan arranger is minimal: both involve the facilitation by a local business of otherwise usurious loans made exempt from Maryland usury laws because the lender is a national bank which can export its home state's interest rates."

Respondent, referring to the reasoning of the Court of Special Appeals, responds that the Commissioner took "an inconsistent . . . position with respect to the CSBA's applicability to RALs" in the H & R Block litigation described in *Raskin, supra,* and involving a statement by the previous Commissioner's office during that litigation that it was "taking a closer look" at RALs and whether tax preparers were subject to the CSBA. According to respondent, that statement demonstrates that, as late as 2007, the Commissioner's office was still formulating its view on the application of the CSBA to RALs.

*Merriam–Webster's Collegiate Dictionary* 588 (10th ed. 2000) defines "inconsistent," in part, as "lacking consistency: **a:** not compatible with another fact or claim <~statements> **b:** containing incompatible elements <an~argument> **c:** incoherent or illogical in thought or actions: CHANGEABLE[.]" Even assuming *arguendo* that the Commissioner's office was still molding its views in 2007, we are not persuaded that the Commissioner has taken "inconsistent positions" regarding the CSBA's applicability to RALs.

 Nevertheless, it appears that, at the earliest, it was 2005, not 2001, when the Commissioner first publicly stated its position on RALs such that the General Assembly might have been aware of the Commissioner's interpretation that the CSBA applies to RAL facilitators. The 2001 and 2002 amendments to the CSBA directly targeted payday lenders, not RALs, and the General Assembly did not expressly indicate an awareness of the Commissioner's interpretation until 2010, when it passed the RAL legislation.[39] Moreover, as noted by the Court of Special Appeals, the 2005 and 2008 Advisory Notices "fail to disclose the methods that the Commissioner employed in interpreting the CSBA to apply to tax preparers

---

**39.** Both the Floor Report Fiscal and the Policy Note for H.B. 1206, which enacted the 2010 RAL legislation, expressly acknowledged the Commissioner's interpretation of the CSBA: "On May 15, 2008, the Commissioner of Financial Regulation issued an advisory notice on the application of the [CSBA] to tax preparers that facilitate refund anticipation loans. . . ."

involved with RALs. It is undisputed that this interpretation was not reached through any kind of adversarial process." *Gomez v. Jackson Hewitt, Inc.*, 198 Md.App. 87, 120–21, 16 A.3d 261, 281 (2011). Based on the *Marriott* factors, we are not persuaded that the Commissioner's is a "long-standing construction ... entitled to great deference." *Marriott Empls.*, 346 Md. at 445, 697 A.2d at 459.

■ According to petitioners, the "public, consistent, and long-standing position of the Office of the Attorney General provides further support for according deference to the Commissioner's interpretation of the statute." This Attorney General Opinion, 79 Op. Md. Att'y Gen. 98 (1994), addresses "whether a home improvement contractor is required to obtain an installment loan license as a prerequisite to offering its customers financing for home improvement projects." *Id.* The Opinion states that

> if the Contractor received compensation ... *either from the borrower or the financing entity* ... for referral of an unsecured loan or for a loan secured by collateral other than real property, the Contractor would fall within the definition of a "credit services business" set forth at CL § 14–1901 and would be required to obtain an installment loan license.

*Id.* at 101 (emphasis added). The Opinion address a substantially different factual scenario from that presented in this case, and "the application of the CSBA was not the focus of the opinion." *Gomez*, 198 Md.App. at 119 n. 6, 16 A.3d at 280 n. 6. Based on these factors, thus, we are not persuaded that the Opinion "should be given great consideration in determining the legislative intention." *Chesek*, 406 Md. at 463, 959 A.2d at 805 (quoting *Crescent Cities*, 330 Md. at 470, 624 A.2d at 960).

■ Finally, petitioners also argue that S.B. 762 (cross-filed as H.B. 1206), which enacted the 2010 RAL legislation specifically regulating RALs, "did not repeal, by implication, the CSBA as it applies to [respondent's] RAL activities." The enacted legislation's "Statement of Purpose" provides:

FOR the purpose of prohibiting certain persons from soliciting the execution of, processing, receiving, or accepting an application or agreement for a refund anticipation loan or refund anticipation check or facilitating the making of a refund anticipation loan or refund anticipation check under certain circumstances; requiring a facilitator of a refund anticipation loan or refund anticipation check to display a certain schedule of fees in a certain manner; requiring the schedule to contain certain information and disclosures; prohibiting a facilitator from charging certain fees; requiring a facilitator to make certain written and oral disclosures to certain consumers at a certain time and in a certain manner; requiring the annual percentage rate for a refund anticipation loan to be calculated using certain guidelines; prohibiting a facilitator from taking certain actions relating to a refund anticipation loan or refund anticipation check; providing that, under certain circumstances, a certain provision of this Act does not prohibit a charge or fee from being imposed by a facilitator; providing that a violation of this Act is an unfair or deceptive trade practice under the [CPA] and is subject to certain enforcement and penalty provisions; establishing certain additional penalties for a willful failure to comply with this Act; defining certain terms; and generally relating to refund anticipation loans and refund anticipation checks.

2010 Md. Laws, ch. 730. Section 14–3802 of the 2010 RAL legislation states:

Unless the facilitator [40] has complied with this subtitle, a facilitator, or an officer, agent, employee, or representative

---

40. Section 14–3801 states:
(d) *Facilitator.*—(1) "Facilitator" means a person who, individually or in conjunction or cooperation with another person:
(i) Processes, receives, or accepts an application or agreement for a refund anticipation loan or refund anticipation check;
(ii) Services or collects on a refund anticipation loan or refund anticipation check; or
(iii) Facilitates the making of a refund anticipation loan or refund anticipation check.

of a facilitator, individually or in conjunction or cooperation with another person, may not:

(1) Solicit the execution of, process, receive, or accept an application or agreement for a refund anticipation loan or refund anticipation check; or

(2) Facilitate the making of a refund anticipation loan or refund anticipation check.

A facilitator must, *inter alia,* display certain fee schedules and make certain written and oral disclosures. CL §§ 14–3803 to –3805. Section 14–3806 states:

(a) *In general.*—A facilitator may not:

(1) Require a consumer to enter into a loan agreement in order to complete a tax return;

(2) *Charge any fee to a consumer or require any other consideration for making or facilitating a refund anticipation loan or refund anticipation check other than the fee imposed by the creditor or other person that provides the refund anticipation loan or refund anticipation check;*

(3) Engage in a transaction, practice, or course of business that operates a fraud on a consumer in connection with a refund anticipation loan or refund anticipation check, including making oral statements that contradict any of the information required to be disclosed under this subtitle;

(4) Arrange, directly or indirectly, for any third party to charge any interest or fee related to a refund anticipation loan or refund anticipation check, other than the refund anticipation loan or refund anticipation check fee imposed by the creditor, including charges for insurance, attorney's fees, collection costs, or check cashing;

(5) Misrepresent a material fact or condition of a refund anticipation loan or refund anticipation check; or

(6) Fail to process an application for a refund anticipation loan promptly after the consumer applies for the refund anticipation loan.

(b) *Certain charges or fees allowed.*—Subsection (a)(2) of this section does not prohibit a charge or fee, *including a fee for tax return preparation,* that is imposed by a facili-

tator on all of its customers if the same charge or fee, in the same amount, is imposed on customers who do not receive refund anticipation loans, refund anticipation checks, or other tax-related financial products.

(Emphasis added.)

Petitioners, pointing to the Commissioner's testimony that S.B. 762 "includes consumer protections in connection with these financial products that *supplement* those set forth in the Credit Services Businesses Act," argue that the 2010 RAL legislation was not "intended to supplant, or to repeal by implication, the application of the CSBA to RALs." (Emphasis added.) *See Dep't of Natural Res. v. France,* 277 Md. 432, 460, 357 A.2d 78, 94 (1976) ("It is a fundamental principle that the law does not favor repeals by implication."). They argue that the two laws can be "construed in harmony," and to the extent they overlap one another, "the more specific enactment [sh]ould be operative." Respondent counters that "the RAL statute—and the accompanying legislative history files—evidences that . . . the General Assembly never intended that the CSBA apply to RALs."

We are not persuaded by petitioners' argument that the 2010 RAL legislation was intended to supplement the CSBA and that RALs would be jointly regulated by both the CSBA and the 2010 RAL legislation. First, by arguing against a "repeal by implication," they presuppose the application of the CSBA to RAL facilitators, a position with which we do not agree. Second, we agree with respondent that:

If the Court were to determine that both the CSBA and the RAL statute apply to [respondent], it would necessarily result in absurd and illogical consequences. Without doubt, confusion would result from the disclosures required by the CSBA—and that confusion would be compounded when combined with those required by the RAL statute. For example, if both the CSBA and RAL statute apply, a consumer would have to be presented with two separate contracts—one for a RAL and one for credit services—in different fonts and including substantially different disclo-

sures. *Compare* C.L. § 14–1906 *with* C.L. §§ 14–3804; 14–3806.

Strikingly, the CSBA includes a three-day cancellation period, whereas the RAL statute requires that a RAL facilitator promptly process a RAL application. *See* C.L. §§ 14–1906(b); 14–3806(a)(6). Now, if under the CSBA, a tax preparer must wait three days before processing an application, that wait would violate the RAL statute's requirement that the application be processed "promptly." If, however, a RAL application is processed promptly, yet a taxpayer decides to "cancel" a credit services agreement, there is really nothing to rescind. The processing has been completed once the application is electronically transmitted to a bank. It is therefore impossible for a RAL facilitator to comply with both the CSBA and the RAL statute....

Finally, the RAL statute provides that a "facilitator" *may* facilitate RALs if the facilitator complies with the RAL statute. *See* C.L. § 14–3802 ("Unless the facilitator has complied with this subtitle, a facilitator ... may not" solicit or facilitate the purchase of a RAL.). It does not say that the facilitator must comply with the RAL statute *and* the CSBA before facilitating a RAL.

Third, we are persuaded by the legislative history of the RAL legislation that the General Assembly never intended the CSBA to apply to RALs. Both The "Current Law/Background" section of the Fiscal and Policy Note for H.B. 1206 and the "Background" section of the Floor Report for H.B. 1206 discuss the CSBA, and state:

On May 15, 2008, the Commissioner ... issued an advisory notice on the application of the [CSBA] to tax preparers that facilitate [RALs].... The [C]ommissioner interpreted [the CSBA] to apply to all businesses (except those specifically excluded under [the CSBA]) that assist consumers in obtaining extensions of credit, including tax preparers who are compensated to assist consumers in obtaining a[RAL] from third-party lenders.

Based on this statement, it is clear that the General Assembly was cognizant of the Commissioner's position that the CSBA applied to "tax preparers who are compensated to assist consumers in obtaining a [RAL] from third-party lenders," but it is hardly clear that the General Assembly agreed with the Commissioner. Passing the 2010 RAL legislation, rather than clarifying by amendment the CSBA, as it did in the case of payday loans, is, in our view, a strong indication that the General Assembly did not share the Commissioner's position that RAL facilitators were covered by the CSBA. Instead, it enacted provisions specifically related to the business to be regulated, including defining "refund anticipation loan" and "facilitator," and providing for applicable disclosures and fees.

Fourth, there is no reference in the 2010 RAL legislation to the CSBA and the need for a license from the Commissioner, but there is a direct reference to the CPA, which would be unnecessary if the CSBA was also applicable to RALs. *Compare* CL § 14–1914 (violation of CSBA is violation of CPA) *with* CL § 14–3807(a) (violation of 2010 RAL legislation is violation of CPA). Moreover, there are certain express enforcement and penalty provisions in the 2010 RAL legislation independent of those of the CSBA. *See* CL § 14–3807(b).

## CONCLUSION

In sum, we believe that, read in the context of the legislation as a whole, the plain language of the CSBA can reasonably and most logically be understood as reflecting the legislative intent that the "payment of money or other valuable consideration" *in return for credit services* flow *directly* from the consumer to the credit services business. Therefore, under the CSBA, respondent is not a "credit services business," and Gomez is not a "consumer." In our view, the CSBA's legislative history, and the adoption of the 2010 RAL legislation specifically regulating RALs, supports and confirms that interpretation.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS
AFFIRMED. COSTS TO BE PAID BY PETITIONERS.**